UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| Kristen Miles Anderson, ) | C/A No. 8:12-3203-TMC-KDW |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | REPORT AND RECOMMENDATION |
| The United States of America; and Richard ) | |
| Kerns, a/k/a Rick Kerns, a/k/a Rick ) | |
| Kearns; ) | |
| ) | |
| Defendants. ) | |
| ) | |

I.    Background

Plaintiff Kristen Miles Anderson ("Plaintiff" or "Anderson") initially brought suit against

the following Defendants: the United States of America ("USA" or the "Government"); Richard

Kerns ("Kerns"), a former agent of the U.S. Secret Service ("USSS" or "Secret Service"); USSS

Special Agents Gregory Johnson and Thomas Griffin, Jr.; USSS Director Mark J. Sullivan;

Secretary Janet Napolitano, Department of Homeland Security ("DHS"); and "others as yet

unknown." *See* Am. Compl., ECF No. 37; *see also* Compl., ECF No. 1. In ruling on a motion to

dismiss brought by all Defendants except Kerns, the court dismissed several causes of action and

dismissed Johnson, Griffin, Sullivan, and Napolitano as Defendants. *See* Opinion and Order

("Order"), ECF No. 84; *adopting in part* Report and Recommendation ("R&R"), ECF No. 73.

After discovery was completed, the USA filed a second Motion to Dismiss, or in the Alternative,

for Summary Judgment,[1] ECF No. 150. Plaintiff responded to the Motion, ECF No. 152, and the

USA filed a reply, ECF No. 153. Having reviewed the parties' filings and considered the

---

[1] Defendant Kerns is separately represented and is not a party to the Motion under consideration.
Nothing in this Report and Recommendation (R&R) is offered as a ruling as to any claims
against or defenses asserted by Defendant Kerns.

applicable law, the undersigned recommends[2] the Motion be *granted and the matter ended as to the USA*.

## II.    Facts

In its Motion, the USA presents its Statement of Material Facts, which sets out facts and supporting citation to record evidence in numbered paragraphs. Defs.' Mem. 2-7. In her response, Plaintiff provides a "Factual Background" that consists of citations to her Amended Complaint only. Pl.'s Mem. 1-4.[3] Plaintiff also responds to the USA's Statement of Material Facts, setting out the material facts she contends remain in dispute. *Id.* at 6-11. Plaintiff includes "additional examples" of material facts in dispute, claiming those examples are not intended to be exhaustive. Pl.'s Mem. 11-15. The parties have completed discovery, and the court considers the facts in the light most favorable to Plaintiff to the extent such facts are supported in the record. *Celotex*, 477 U.S. at 324. Notably, though, portions of Plaintiff's memorandum rely only on the facts she alleged in her Amended Complaint. The following numbered list of facts is taken largely from Defendant's Memorandum, and notes any disagreement with the numbered facts Plaintiff expressed in her Memorandum.

1.    The United States Secret Service ("Secret Service") is a bureau of the DHS and is a law enforcement agency operating under the provisions of Title 18, United States Code, Section 3056. 18 U.S.C. § 3056.

2.    On December 3, 2009, Johnson and Defendant Kerns were employed as Special Agents (SAs) with the Secret Service in the Greenville Resident Office (GRO).

3.    On December 2, 2009, SunTrust Bank investigator William Galipeau contacted Plaintiff and advised her that he needed to interview her regarding money she had taken from the bank. Bill Galipeau Statement 1, ECF No. 150-1. During that conversation, Plaintiff asked Mr. Galipeau whether she needed an attorney. Galipeau responded that Plaintiff "needed to make that

---

[2] All pretrial proceedings in this case were referred to the undersigned pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Local Civil Rule 73.02(B)(2), D.S.C. Because the Motion is a dispositive one, this R&R is entered for the district judge's consideration.

[3] Plaintiff's "Factual Background" section of her memorandum seems to be identical to the "Summary of Facts" in her memorandum opposing the USA's previous Motion to Dismiss. *See* ECF No. 60 at 1-6.

decision for herself, but that [Galipeau] would not speak to her with the attorney and would just file the case with law enforcement." *Id.*

4.    On December 3, 2009, Galipeau and SunTrust investigator Loretta Norris interviewed Plaintiff at a SunTrust Bank branch in Greenville. *Id.* at 2. Prior to this interview, Norris contacted the Secret Service GRO and let GRO know they would be interviewing Plaintiff that day. *Id.*; Norris Dep. 19, ECF No. 150-2.

5.    During her interview with the SunTrust Bank investigators, Plaintiff confessed to taking money from the bank. Galipeau Statement 2. Johnson and Kerns were at the SunTrust branch during Plaintiff's interview by Galipeau and Norris, but they were not in the room during that interview. *Id.* After confessing to the SunTrust investigators, Plaintiff was introduced to Johnson and Kerns, who were identified as Secret Service agents. *Id.* Plaintiff agreed to speak with the agents. *Id.*[4]

6.    According to Johnson and Norris, Johnson and Kerns provided Plaintiff with *Miranda*[5] warnings prior to interviewing her, Norris Dep. 22; Norris Statement; Johnson Statement, ECF No. 150-3, and advised her she was free to leave at any time and was not under arrest. Johnson Dep. 22-23, ECF No. 150-4.[6] At the time of the interview, Plaintiff signed a sworn statement that informed her that she had the right to an attorney and that if she could not afford an attorney one would be provided for her. Pl.'s Dec. 3, 2009 Statement 1, ECF No. 150-5.

a.    The printed portion of Plaintiff's December 3, 2009 sworn statement provides as follows:

I, Kristen Anderson, being first duly sworn according to the law, depose and say: I have been advised by Special Agent Rick Kerns, United States Secret Service, that under the provisions of the Constitution, I cannot be compelled to be a witness against myself; that I have the right to remain silent; that I have the right to talk to an attorney before being questioned

---

[4] Galipeau indicated he asked Plaintiff whether she wished to speak with Johnson and Kerns prior to their entering the room, and she agreed to speak with them. Galipeau Statement 2-3. Plaintiff submits a question of fact exists as to the timing of her agreeing to speak with the agents, noting Norris had indicated in an interview with the Office of the Inspector General (OIG) that, after she and Galipeau completed their interview of Plaintiff, "Kerns and Johnson were introduced to [Plaintiff]," at which time Plaintiff "'agreed' to talk" with the agents. Pl.'s Mem. 6-7; *see* Norris OIG Interview Summary, ECF No. 152-4. Interestingly, Plaintiff does not provide her own version of this timing. From its independent review of the record, the court notes Plaintiff testified that she recalled Galipeau and Norris left the room after they had interviewed her and they then walked back in with the Secret Service agents. Pl.'s Dep. 157, ECF No. 150-6. In any event, the precise timing of when Plaintiff said she would speak with Johnson and Kerns is not material to the undersigned's recommendation.

[5] *Miranda v. Arizona*, 384 U.S. 436 (1966).

[6] Plaintiff indicates it is disputed whether she was provided *Miranda* warnings and whether she was told she was free to leave at any time. *See* Pl.'s Mem. 7. As discussed below, questions of whether Plaintiff was *Mirandized* on December 3, 2009, and whether she was arrested or her interview was a "custodial" one are not determinative of the undersigned's recommendation.

and to have an attorney present at the time I am questioned; that if I cannot afford an attorney and want one, an attorney will be appointed for me by the court. If I decide to answer questions now, or make a written statement, without an attorney present, I understand I still have the right to stop the questioning at any time.

I have read the above paragraph outlining my rights and it has been read to me. I understand what my rights are. I am willing to make a statement and answer questions. I do not want an attorney present at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or force of any kind has been used against me. This statement is a voluntary act on my part, prompted by my desire to tell the facts, and I do not expect to gain any reward or special consideration by reason of making this statement.

*Id.* at 1.

        b.   In her deposition, Plaintiff acknowledged her signature on the December 3, 2009 statement, but indicated she did not specifically recall telling the USSS agents everything in the statement. Pl.'s Dep. 158-59.

7.      After the interviews, Plaintiff went to the GRO with Johnson and Kerns to have her photograph and fingerprints taken. Johnson Dep. 25-26.[7] Plaintiff was not handcuffed at any point. She rode to the GRO in the back of a government vehicle. Pl.'s Dep. 158.

8.      After taking her fingerprints and photographs at the GRO, Johnson and Kerns drove Plaintiff back to her car at SunTrust Bank. Pl.'s Dep. 159.

9.      Plaintiff advised the OIG that Kerns telephoned her later on December 3, 2009, and "told her that he was worried about her." OCG Report, ECF No. 152-10. Plaintiff submits the call was placed from Kerns' telephone at the GRO.[8] The first telephone call between Plaintiff and Kerns of which there are express records took place on December 4, 2009, at 3:50 p.m., when Plaintiff called Kerns from (864) 980-6539 on his government-issued Blackberry device and the conversation lasted six minutes. Kerns' Blackberry Phone Records 1, ECF No. 150-7.

10.    On December 7, 2009, at 2:51 p.m., Plaintiff called SA Kerns on his Blackberry device and the conversation lasted 17 minutes. *Id.* at 2.

11.    On December 7, 2009, at 8:00 p.m., Kerns called Plaintiff and the conversation lasted four minutes. *Id.*

---

[7] Plaintiff submits there is conflicting evidence regarding whether Plaintiff was "asked" or "told" she was to go to the GRO for processing, and that factual issues remain as to whether she was "in custody" on December 3, 2009. Pl.'s Mem. 7. As discussed below, questions of whether Plaintiff was arrested or was in custody on December 3, 2009, are not determinative of the undersigned's recommendation.

[8] USA notes there is no record that Kerns telephoned Plaintiff on December 3, 2009, Def.'s Reply 2, but does not dispute whether such a call was placed.

12.    An OIG investigator analyzed call records for Kerns' government-issued Blackberry device from November 24, 2009 through April 23, 2011 and found that "approximately 81 telephone calls were sent from Kern's (sic) [government-issued] cellular telephone to [Plaintiff's] cellular telephone and 40 telephone calls were sent from [Plaintiff's] cellular telephone [] to Kern's (sic) cellular telephone. May 23, 2011 Report from OIG Special Agent Jerry Coleman, ECF No. 152-11.

13.    At some point in January or February 2010, Kerns drove to Greenwood, SC (where Plaintiff lived) and met Plaintiff at Self Regional Hospital. May 18, 2011 Statement of Plaintiff to OIG Investigator 1-2, ECF No. 150-8. Plaintiff indicated the meeting had not been planned. She indicated Kerns had called her, told her he was already in Greenwood and had information on her case. Kerns told her to meet him in the hospital parking lot. Pl.'s Dep. 81. After Kerns arrived at the hospital, he got in Plaintiff's vehicle, and Kerns told Plaintiff to "drive." Pl.'s Dep. 84. Kerns did not specify where Plaintiff should drive; she drove them to the Ninety-Six Historic Site. Pl.'s May 18, 2011 Statement 2. During the drive, Plaintiff and Kerns talked about their marriages and also about her case. *Id.* While at the Ninety-Six Historic Site, Kerns kissed Plaintiff and told her that he could lose his job if anyone found out. *Id.*

14.    On January 29, 2010, Kerns completed a "New Case Number Request Form," which was approved by GRO's Acting Resident Agent in Charge ("RAIC") Iris Hughes. New Case Form, ECF No. 150-9.[9]

15.    On March 18, 2010, Kerns called Plaintiff "all day telling [her] his wife was out of town [and she] should come have a drink with him." Pl.'s May 18, 2011 Statement 2. Records from the carrier for Kerns' government-issued cellular phone note Kerns initiated a call on that phone to Plaintiff's cell phone at 4:59 p.m. Phone records 19, ECF No. 150-7. Plaintiff called Kerns at that same number at 5:18 p.m. Both of these calls lasted one minute. *Id.* At 6:19 p.m., Kerns called Plaintiff; that call lasted 10 minutes. Kerns again called Plaintiff at 9:45 p.m.; that call lasted 1 minute. *Id.* Plaintiff called Kerns at 10:50 p.m. (2-minute duration) and 10:55 p.m (3-minute duration). *Id.* at 19-20; *see also* OIG Report, ECF No. 152-11. In her deposition, Plaintiff stated she initially did not want to meet Kerns in Greenville and did not have a babysitter for her child. Plaintiff indicated Kerns told her she needed to meet him to discuss her case. Pl.'s Dep. 94, ECF No. 152-24.

16.    Plaintiff drove to downtown Greenville and met Kerns in the parking lot of the Holiday Inn Express "beside" the GRO. Pl.'s May 18, 2011 Statement 2.[10] They walked to a bar across

---

[9] The USA characterizes this form as indicating Kerns "officially opened a case on Plaintiff at the GRO." Def.'s Mem. 4. In responding to this factual paragraph, Plaintiff submits that "[f]actual disputes remain as to who actually prepared the document and when, as well as differences in handwriting." Pl.'s Mem. 9. Plaintiff provides no record evidence (other than a copy of the form itself) to support that claim.

[10] Based on one page of a statement Kerns apparently gave to an OIG investigator, Kerns indicated he was driving his personal vehicle that evening. ECF No. 152-21 (page 3 of a 6-page Memorandum, the rest of which is not in the record). Although Plaintiff submits Kerns was in a government-owned vehicle that day, she does not provide record evidence to support that

the street. *Id.* In her statement, Plaintiff said that Kerns wanted to go into the GRO with Plaintiff, but she told him that she thought she had come for drinks and they went to a bar. *Id.* at 3. When asked what they discussed at the bar, Plaintiff said she was "mad because [Kerns] told [her] it was about [her] case, and then when [she] got there it wasn't about [her] case." Pl.'s Dep. 99, ECF No. 152-25. While they were at the bar, Kerns made an explicit verbal sexual advance toward Plaintiff. Pl.'s May 18, 2011 Statement 2. Plaintiff told Kerns she needed to leave. Pl.'s Dep. 99, ECF No. 152-25.

17.    Upon leaving the bar, Kerns told Plaintiff he had to go into his office at the GRO and for her to go with him. Pl.'s May 18, 2011 Statement 2. Kerns showed Plaintiff his office and then took her to his boss's office, which contained two sofas. *Id.* Kerns then "took his gun off[11] and unzipped his pants." *Id.* Plaintiff indicated she "did not know what to do" and "did not want to make [Kerns] mad because he kept telling [her] he was on [her] side and all [she] had to do was trust him and he was going to make sure [she] didn't go to prison and that [she] got probation." *Id.* at 3-4. They had sexual intercourse, and Plaintiff then got dressed and left. *Id.* at 4. Kerns walked Plaintiff to her car and told her to call him when she got home safely. *Id.* When she was leaving, Kerns told Plaintiff that he "would lose his job" if "they found out [what] had happened[.]" Pl.'s Dep. 110, ECF No. 152-27. Kerns had told her that the bank wanted to increase the criminal charges against her and that "if he wasn't there, he was the only one that was on [her] side." *Id.* at 110-11.   Plaintiff indicated she did call Kerns when she arrived at home, but he did not return the call. Pl.'s Statement 4.

> a.    Plaintiff avers Kerns also told her on March 18, 2010, that "[i]t was a good thing that my boss wasn't here because he would have tried to grab you first." Am. Compl. ¶ 20; *cf.* Pl.'s Dep. 184, ECF No. 152-28 (noting she was unsure of exactly when Kerns made that statement). Kerns denies having said this. Kerns Dep. 39.

18.    GRO records indicate Kerns entered the GRO at 10:52:05 on March 18, 2010, and left at 10:57:58 p.m. Open/Close Signal History Report 2, ECF No. 150-11. Kerns again entered the GRO at 11:38:47 p.m. on March 18, 2010 and exited at 12:35:59 a.m. on March 19, 2010. *Id.*

19.    On May 26, 2010, Kerns submitted his first case status report to his GRO supervisor ("Criminal Investigative Unit") regarding his criminal investigation of Plaintiff. May 26, 2010 "Report of Continuing Investigation" submitted by Kerns to the "Criminal Investigative Unit," ECF No. 150-10. This report did not include any reference to his meetings with Plaintiff in Greenwood, SC, or in Greenville on March 18, 2010. *See id.*

---

statement. *See* Pl.'s Mem. 13. In any event, this fact is not material to the undersigned's recommendation.

[11] Contrary to her statement, in her deposition, Plaintiff indicated Kerns had kept his gun on his leg, and she did not believe he ever took it off. Pl.'s Dep. 109, ECF No. 152-27. Plaintiff said Kerns never pointed the gun at her and never verbally threatened her with the gun. *Id.* This discrepancy is not material to the undersigned's recommendation. Further, "[a] genuine issue of material fact is not created where the only issue of fact is to determine which of the two conflicting versions of the plaintiff's testimony is correct." *Barwick v. Celotex Corp.*, 736 F.2d 946 (4th Cir. 1984).

20.    On September 8, 2010, Kerns submitted another status report to his GRO supervisor. This report noted Plaintiff's federal arrest on August 26, 2010. ECF No. 150-12. The report indicated a federal grand jury indicted Plaintiff on August 10, 2010, and she was arraigned on August 26, 2010. A not-guilty plea was entered, and Plaintiff was released on a personal recognizance bond. *Id.*

21.    On April 13, 2011, Plaintiff informed U.S. Probation Officer Robin Brown ("USPO Brown") that on March 18, 2010, Kerns had taken her back to his boss's office and had sex with her Statement of USPO Brown, ECF No. 150-13.[12] Plaintiff indicated Kerns had told her he "would help get her probation." *Id.* Plaintiff told Brown she had not told anyone before because "she didn't want to go to jail and she thought [Kerns] was going to help her. She decided to report what happened between them when he told her he couldn't help her with her case." *Id.*

22.    On April 13, 2011, Brown contacted Assistant United States Attorney William Watkins ("AUSA Watkins"), the AUSA assigned to Plaintiff's criminal case, and informed him of Plaintiff's allegations. July 12, 2011 Statement of AUSA Watkins 2, ECF No. 150-14.

23.    Later on April 13, 2011, AUSA Watkins called Kerns and informed him that Plaintiff had made allegations against him. AUSA Watkins mentioned "phone calls, the text messages, and [he is] reasonably confident [he] mentioned the sex allegations." AUSA Watkins Statement 2. Kerns was advised by AUSA Watkins that AUSA Watkins would have to inform Kerns' supervisor RAIC Thomas Griffin (a former Defendant), of the allegations if Kerns did not self-report to RAIC Griffin by the following day. *Id.*

24.    Kerns was on a house-hunting trip in Washington, D.C. at the time. Watkins called RAIC Griffin on April 13, 2011, and informed him of Plaintiff's allegations. At that time, Kerns denied Anderson's allegations. April 19, 2011 RAIC Griffin Mem. 1, ECF No. 150-15.

25.    On April 14, 2011, RAIC Griffin made arrangements to speak with Plaintiff through her attorney. Griffin Mem. 2. On that same date, Plaintiff repeated to RAIC Griffin that Kerns had sex with her on March 18, 2010 in the "boss'" office. Plaintiff also drew a diagram of this office for RAIC Griffin. *Id.*

26.    Continuing on April 14, 2011, Kerns contacted RAIC Griffin and admitted that he had "a sexual encounter" with Plaintiff in the GRO. *Id.* Kerns "was adamant that at no time had he ever offered help or assistance to [Plaintiff] regarding her pending charges in exchange for sex." *Id.*[13] Kerns could not recall the exact date of the sexual encounter, but indicated he was intoxicated when it occurred. Kerns further advised RAIC Griffin that he "may in fact have an alcohol problem which he felt contributed to his lack of judgment." *Id.*

27.    According to Griffin, on April 15, 2011, Kerns met with DAD Eisenbeiser in Washington DC (whom the USA characterizes as a Secret Service supervisor in Washington, DC, Def.'s

---

[12] USPO Brown's statement indicates Plaintiff told her about Kerns' actions on April 14, 2011. ECF No. 150-13 at 2. The USA indicates all other witnesses advised this took place on April 13, 2011. Def.'s Mem. 5 n.2. The precise date of this event is not material.

[13] Whether Kerns advised Plaintiff he could "get her probation" for her charges is a contested fact. The undersigned includes it here for completeness.

Mem. 6). April 19, 2011 RAIC Griffin Mem. 1, ECF No. 150-15. At that time, Kerns relinquished control of his government-issued Blackberry[14] and other government property he had with him in Washington, D.C. *Id.*; *see also* May 23, 2011 OIG Mem. of Interview with RAIC Griffin, ECF No. 150-16.

28.    On August 17, 2011, the Secret Service Chief of the Security Clearance Division sent a Notice of Determination to the Special Agent in Charge (SAIC) of the Columbia Field Office, Michael Williams, revoking Kerns' Top Secret Security Clearance. Aug. 17, 2011 email between Security Clearance Division and SAIC Williams, ECF No. 150-21.

29.    On August 17, 2011, Kerns submitted his resignation from the Secret Service to SAIC Williams. Kerns' resignation letter, ECF No. 150-22.

30.    On April 18, 2011, RAIC Griffin and another agent met with Kerns at Kerns' residence, at which time Kerns turned over his remaining government-issued equipment and vehicle. Griffin Mem. 2.

31.    On April 19, 2011, Griffin submitted to the Secret Service Security Clearance Division Kerns' executed Top Secret Security Clearance revocation documentation, which Kerns had signed on April 18, 2011. *See* April 18-19, 2011 email correspondence, ECF No. 150-18.

32.    On April 20, 2011, the Secret Service Office of Inspection ("ISP") and the DHS OIG initiated a case to investigate Kerns' potentially criminal misconduct. ISP Case Initiation Form, ECF No. 150-19; ISP Mem. Report, ECF No. 150-20. The Report indicated a Case Type of "Criminal-Tampering with a Witness, Victim or Informant." ISP Mem. Report 1.

33.    Prior to his employment with the Secret Service, Kerns submitted a Questionnaire for National Security Positions on September 19, 2002. Kerns' Questionnaire for National Security Positions, ECF No. 150-23. Special Investigator James Bartee performed a background check on Kerns; that check did not reveal any derogatory information. Kerns' background check by Bartee, ECF No. 150-24.

34.    From September 2, 2008 to July 15, 2010, the Secret Service conducted a security update investigation on Kerns in which no derogatory information was found. Kerns' Security update synopsis, ECF No. 150-25.

III.    Standard of Review

    A. Rule 12(b)(1)

The USA moves to dismiss Plaintiff's Amended Complaint pursuant to Federal Rule of

Civil Procedure 12(b)(1), and, alternatively, seeks summary judgment pursuant to Rule 56. ECF

---

[14] Plaintiff submits it is a "contested fact" as to when Kerns "surrendered his cell phone," although she proffers no evidence as to when it was surrendered. Pl.'s Mem. 10-11. Plaintiff indicates Griffin did not take Kerns' personal cell phone, although he knew, or should have known, Kerns had used it to contact Plaintiff. *Id.*

No. 150.[15] "The question of subject matter jurisdiction may be raised at any time during the course of the lawsuit." *Miller v. United States*, No. 2:11-CV-03026-DCN, 2012 WL 6674492, at *1 (D.S.C. Dec. 21, 2012) (citing *Arbaugh v. Y & H Corp.,* 56 U.S. 500, 514 (2006)). Motions brought pursuant to Rule 12(b)(1) challenge whether the district court has jurisdiction over the action.

When subject matter jurisdiction is challenged under Rule 12(b)(1), the plaintiff bears the burden of proof. *See Richmond, Fredericksburg & Potomac R.R. Co. v. United States,* 945 F.2d 765, 768 (4th Cir. 1991). "The district court should apply the standard applicable to a motion for summary judgment, under which the nonmoving party must set forth specific facts beyond the pleadings to show that a genuine issue of material fact exists." *Id.; see also Federico v. Lincoln Military Hous., LLC*, No. 2:12CV596, 2015 WL 5123324, at *12 (E.D. Va. Aug. 31, 2015) (citing *Richmond* for these principles). In this case, the parties have completed full discovery. *Cf. Kerns v. United States*, 585 F.3d 187, 192-93 (4th Cir. 2009) (noting a defendant should be afforded "procedural safeguards—such as discovery" when the court is considering jurisdictional facts "intertwined with the facts central to the merits of the dispute").

B.  Rule 56

The court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial burden of demonstrating that summary judgment is appropriate; if the movant carries its burden, then the burden shifts to the non-movant to set forth specific facts showing that there is a genuine issue for trial. *See Celotex Corp. v. Catrett*, 477

---

[15] The USA's Motion is also styled as one brought pursuant to Federal Rule of Civil Procedure 12(b)(6). ECF No. 150 at 1. In support of its Motion, however, the USA does not reference Rule 12(b)(6). The parties have engaged in, and completed, discovery; both parties have presented evidence beyond the pleadings. Accordingly, the court will consider this matter a Motion brought under Rule 12(b)(1) and, alternatively, under Rule 56.

U.S. 317, 322-23 (1986). If a movant asserts that a fact cannot be disputed, it must support that assertion either by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials;" or "showing . . . that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

In considering a motion for summary judgment, the evidence of the non-moving party is to be believed and all justifiable inferences must be drawn in favor of the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248. All that is required is that "sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson*, 477 U.S. at 249. "Mere unsupported speculation . . . is not enough to defeat a summary judgment motion." *Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 62 (4th Cir. 1995). A party cannot create a genuine issue of material fact solely with conclusions in his or her own affidavit or deposition that are not based on personal knowledge. *See Latif v. The Cmty. Coll. of Baltimore*, 354 F. App'x 828, 830 (4th Cir. 2009) (affirming district court's grant of summary judgment, noting plaintiff's affidavit, which offered conclusions not based on his own knowledge, did not create genuine issues of material fact). "Rule 56(e) [] requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)).

IV.    Analysis

The USA seeks dismissal of all claims remaining against it: Federal Tort Claims Act ("FTCA") claims for supervisory liability,[16] intentional infliction of emotional distress ("IIED") resulting from Kerns' conduct, and negligence claims. The USA first seeks Rule 12(b)(1) dismissal of the supervisory liability claims based on the discretionary-act exception in the FTCA. Alternatively, the USA seeks summary judgment as to the supervisory liability claims. The USA also seeks summary judgment as to any other remaining claims, including potential IIED liability for the actions of Kerns and any remaining negligence claims. All told, the USA seeks dismissal of all claims brought against it, ending this litigation as to it. Plaintiff argues the USA has waived its right to raise the FTCA's discretionary-act exception. She also argues the USA is not otherwise entitled to judgment as a matter of law. To the extent practicable, the court considers issues in the order presented in the USA's Motion.

A.  Claims as to actions of those other than Kerns

1.  Supervisory-liability claim

In ruling on the USA's prior motion to dismiss, the court found Plaintiff had pleaded a plausible claim for supervisory liability under the FTCA. *See* Order 5. Although not raised in its Motion to Dismiss, the USA now asserts the court lacks jurisdiction over Plaintiff's supervisory-liability claims based on the FTCA's discretionary-function exception. Alternatively, the USA argues it is entitled to summary judgment on any supervisory-liability claim because Plaintiff has proffered no evidence to support such a claim.

a.   The USA's subject-matter-jurisdiction challenge

The court considers the jurisdictional challenge first. "The United States, as sovereign, is immune from suit save as it consents to be sued . . . ." *United States v. Sherwood*, 312 U.S. 584,

---

[16] Unless otherwise stated, reference to "supervisory liability" includes Plaintiff's claims related to negligent hiring, supervision, retention, and training.

586 (1941); *see also Frahm v. United States*, 492 F.3d 258, 262 (4th Cir. 2007) (citing *Sherwood*). Sovereign immunity is jurisdictional and the terms of the government's consent to be sued in any court define that court's jurisdiction to consider such a suit. *F.D.I.C. v. Meyer,* 510 U.S. 471, 475 (1994). A waiver of sovereign immunity "cannot be implied but must be unequivocally expressed." *United States v. King,* 395 U.S. 1, 4 (1969). The government's waiver of immunity must be construed strictly in favor of the sovereign, making it "the plaintiff's burden to show that an unequivocal waiver of sovereign immunity exists and that none of the statute's waiver exceptions apply to his particular claim." *Welch v. United States,* 409 F.3d 646, 651 (4th Cir. 2005) (internal citations omitted).

For those plaintiffs asserting tort claims against the Government, Congress issued a limited waiver of sovereign immunity in the FTCA. Under this statute, the United States waives sovereign immunity for "injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1).

i.  The discretionary-function exception

The FTCA's waiver of sovereign immunity is narrow and subject to exceptions, however. Many of the exceptions are codified in 28 U.S.C. § 2680. Relevant here is the discretionary function exception, found at 28 U.S.C. § 2680(a). Under this exception, the waiver of sovereign immunity does not extend to a claim "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. §

2680(a). Therefore, a court lacks subject-matter jurisdiction to adjudicate a claim in which a government actor performed a discretionary function or duty that resulted in tortious conduct.

ii.  Plaintiff's argument of waiver

Plaintiff argues the USA has waived its Rule 12(b)(1) challenge to jurisdiction under the discretionary-function exception because the Government did not raise that FTCA exception as an affirmative defense in answering the Amended Complaint. Pl.'s Mem. 15-16. As authority in support of its waiver theory, Plaintiff relies on the Seventh Circuit Court of Appeal's decision in *Stewart v. United States*, 199 F.2d 517 (7th Cir. 1952).

The USA's jurisdictional challenge is not waivable. While it is true that, in *Stewart*, the Seventh Circuit found the government had waived its subject-matter-jurisdiction challenge based on the discretionary-function exception, it did so only when the government first raised the exception on a second appeal that was considering damages. "This [*Stewart v. United States*] view of the Federal Tort Claims Act and its exceptions, however, is not followed in this circuit, or any other circuit including the Seventh." *Richardson v. United States*, 943 F.2d 1107, 1113 (9th Cir. 1991). Of course, no Seventh Circuit decision would be binding on this court. In addition, "[s]ubject-matter jurisdiction can never be waived or forfeited." *Gonzalez v. Thaler*, 132 S. Ct. 641, 648 (2012) (in habeas corpus context). Further, Rule 12(h)(3) requires the court to dismiss actions "at any time" it determines it lacks subject-matter jurisdiction. *Cf. Roberts v. United States*, No. 9:13-CV-3394-DCN, 2015 WL 4546038, at *2 n.4 (D.S.C. July 28, 2015) (considering FTCA Rule 12(b)(1) challenge raised after responsive pleadings had been submitted).

The undersigned recommends finding Plaintiff's waiver challenge to be without merit. Accordingly, the court considers the government's argument that the discretionary-function exception requires dismissal of Plaintiff's supervisory-liability claims.

iii.   Analysis of discretionary-function-exception argument

The USA argues Plaintiff's supervisory-liability claims are barred by the discretionary-function exception, claiming supervision, hiring, and retention decisions involve elements of judgment and are the type of matters the exception was designed to shield. *See* Def.'s Mem. 11-12. The undersigned agrees.

As the United States Supreme Court has explained, the purpose of the discretionary-function exception is to "prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *United States v. S.A. Empresa De Viacao Aerea Rio Grandense,* 467 U.S. 797, 814 (1984). The Supreme Court set forth a two-part test to determine when a function is discretionary. *Berkovitz v. United States*, 486 U.S. 531 (1998). First, discretionary conduct must involve "an element of judgment or choice" on behalf of the person or agency performing it. *Id.* at 536. Second, when some element of judgment or choice is involved, the exception protects "governmental actions and decisions based on considerations of public policy." *Id.* at 537. The public policy inquiry focuses "not on the agent's subjective intent in exercising the discretion conferred by statute or regulation, but on the nature of the actions taken and on whether they are susceptible to policy analysis." *United States v. Gaubert,* 499 U.S. 315, 325 (1991).

In the Fourth Circuit, decisions regarding the hiring, supervision, and retention of employees are protected under the discretionary function exception to the FTCA. *See Suter v. United States*, 441 F.3d 306, 312 n.6 (4th Cir. 2006) (finding claim FBI negligently hired and supervised an agent barred by discretionary-function exception, noting "[c]ourts have repeatedly held that government employers' hiring and supervisory decisions are discretionary functions."). *See also LeRose v. United States*, 285 F. App'x 93, 97 (4th Cir. 2008) ("The [federal Bureau of Prison's (BOP)] decisions regarding the hiring, supervision and retention [of BOP

employee/alleged tortfeasor] are precisely the type of decisions that are protected under the discretionary function exception.). In *LeRose*, the plaintiff sought FTCA governmental liability as to actions by a BOP agent who had attempted to extort money. The court found plaintiff's claims for negligent hiring, supervision, and retention of that agent were barred by the discretionary-function exception. As the Fourth Circuit noted,

> the hiring of an employee involves several public policy considerations including the weighing of the qualifications of candidates, weighing of the backgrounds of applicants, consideration of staffing requirements, evaluation of the experience of candidates, and assessment of budgetary and economic considerations. Because this process is multi-faceted, it is precisely the type of decision that Congress intended to shield from liability through the discretionary function exception.

285 F. App'x at 97. A law enforcement agency's decision regarding the hiring, retention, and supervision of a criminal investigator "is one which we would expect inherently to be grounded in considerations of policy." *Baum v. United States*, 986 F.2d 716, 720-21 (4th Cir. 1993). Moreover, when a statute, regulation, or agency guideline permits a government agent to exercise discretion, "it must be presumed that the agent's acts are grounded in policy when exercising that discretion." *Gaubert*, 499 U.S. at 324.

Plaintiff argues the discretionary-function exception is inapplicable, claiming the USA has oversimplified the issue. Pl.'s Mem. 16-19. Plaintiff submits that, even though the initial undertaking of hiring Kerns might be a discretionary action, the "failures to supervise Kerns and to terminate his employment were operational activities rather than discretionary functions." Pl.'s Mem. 18 (citing *Medley v. United States*, 543 F. Supp. 1211 (N.D. Cal. 1982)). Plaintiff also cites several older cases from the Fourth Circuit Court of Appeals in which the discretionary-function exception did not apply once the government entity had exercised its discretion to undertake an action. *E.g., White v. United States,* 317 F.2d 13, 16-19 (4th Cir. 1963) (finding decision to permit mentally ill patient freedom to roam hospital grounds not exempted from FTCA liability once it exercised discretion to undertake treatment); *Somerset Seafood Co.*

*v. United States*, 193 F.2d 631, 635 (4th Cir. 1962) (finding once government, in its discretion, decided to mark a wrecked ship its discretion ended and it could be liable in negligence under the FTCA for negligently marking the wreck).

The undersigned agrees with the USA that the discretionary-function exception bars Plaintiff's claim of negligent hiring, supervision, and retention. As the USA notes on reply, the cases cited by Plaintiff are inapposite as none of Plaintiff's cited cases considered claims of negligent hiring, supervision, or retention. Fourth Circuit law is clear that "government employers' hiring and supervisory decisions are discretionary functions." *Suter*, 441 F.3d at 312 n.6; *see also Cash v. United States*, No. CIV. WDQ-12-0563, 2012 WL 6201123, at *10 (D. Md. Dec. 11, 2012) (finding discretionary-function exception applied to plaintiff's claims of hiring, retention, and entrustment of a firearm were policy choices protected by the exception; discounting the plaintiff's argument that the U.S. agents "had a duty to use due care and failed to do so."). Plaintiff suggests the law should apply differently to a negligent hiring claim than to a negligent supervision or retention claim. She has cited no authority—from the Fourth Circuit or elsewhere—to support her theory.

Because the discretionary-function exception of the FTCA applies to Plaintiff's claims that the USA negligently hired, supervised, or retained Kerns, the court lacks jurisdiction over such claims. The USA's Motion to Dismiss under Rule 12(b)(1) should be granted as to such claims.[17] To the extent Plaintiff's negligent-supervision and retention claims are hinged on the USA's violation of any established government policy, they would not be covered by the discretionary-act exception, *see Roberts*, 2015 WL 4546038, and are considered part of the general negligence claim, *infra*.

---

[17] Plaintiff's claims that the USA is liable in negligence other than negligent hiring, supervision, or retention, are discussed below.

b.   Alternative analysis on merits of supervisory-liability claims

In the event the court finds it has jurisdiction over Plaintiff's claim for negligent hiring, supervision, and retention, the USA argues in the alternative that it is entitled to summary judgment on such claims because Plaintiff has not provided evidence to support those claims. Def.'s Mem. 12-15. Plaintiff argues genuine issues of material fact exist as to these claims, making summary judgment inappropriate. Pl.'s Mem. 19-21.

South Carolina substantive law applies to Plaintiff's FTCA claims. 28 U.S.C. § 1346(b)(1). As the parties note, South Carolina law recognizes an employer must exercise reasonable care to control an employee acting outside of the scope of his employment under certain scenarios. In *Degenhart v. Knights of Columbus*, 420 S.E.2d 495, 496 (S.C. 1992), the South Carolina Supreme Court found that, while the common law ordinarily imposes no duty to act, there are certain circumstances in which an employer may be held liable for the intentional misdeeds of its employee. In *Degenhart*, the court cited to section 317 of the Restatement of Torts (2d), and found that an employer may be held liable for negligent supervision if the employee, outside the scope of his employment, intentionally harms another when he:

(i)     is upon the premises in possession of the [employer] or upon which the [employee] is privileged to enter only as his [employee], or
(ii)    is using a chattel of [the employer], and . . . [the employer]
  (i)     knows or has reason to know that he has the ability to control his [employee], and
  (ii)    knows or should have known of the necessity and opportunity for exercising such control.

*Degenhart*, 420 S.E.2d at 496 (quoting Restatement (Second) of Torts § 317 (1965) (alterations in *Degenhart*). The South Carolina Supreme Court revisited this duty and stated the following:

In circumstances where an employer knew or should have known that its employment of a specific person created an undue risk of harm to the public, a plaintiff may claim that the employer acted negligently in entrusting its employee with a tool that created an unreasonable risk of harm to the public.

*James v. Kelly Trucking, Co.*, 661 S.E.2d 329, 330 (S.C. 2008). Supervisory liability under *Degenhart* and its progeny requires the court to focus specifically on what the employer knew or should have known about the specific conduct of the employee in question. *See also Rickborn v. Liberty Life Ins. Co.*, 468 S.E.2d 292, 302-03 (S.C. 1996) (finding defendant employer breached duty of care to plaintiff who was harmed by its employee/agent's negligent mishandling of insurance application because employer had notice of that employee/agent's prior negligent mishandling of insurance applications); *Charleston, S.C. Registry for Golf and Tourism, Inc. v. Young Clement Rivers and Tisdale, LLP*, 598 S.E.2d 717, 723 (S.C. Ct. App. 2004) (finding supervisory liability inappropriate when the record contained no evidence that the defendant knew, or should have known, of its employee's conduct causing the alleged harm); *Doe by Doe v. Greenville Hosp. Sys.*, 448 S.E.2d 564 (S.C. Ct. App. 1994) (holding defendant knew or should have known of the necessity to control based on a similar prior instance of inappropriate sexual conduct with a minor); *Brockington v. Pee Dee Mental Health Ctr.*, 433 S.E.2d 16 (S.C. Ct. App. 1993) (concluding that no evidence existed to support the contention that defendant knew or should have known of the necessity to exercise control over its employee prior to the time he assaulted the patient).

Accordingly, the question is whether Defendant USA knew or should have known facts about Defendant Kerns that would suggest employing and retaining Kerns as a USSS agent with authority to investigate criminal matters and have contact with criminal targets would pose an unreasonable risk of harm. Defendant USA seeks summary judgment, arguing there is not a "scintilla of evidence" in the record supporting the conclusion that the USA knew or should have known that Kerns' employment posed an unreasonable risk of harm. Def.'s Mem. 12; *see* Def.'s Mem. 12-15.

The USA provides detailed record support for its argument. Prior to hiring Kerns, the USSS performed a thorough background check on him. *See* Questionnaire completed by Kerns in September 2002, ECF No. 150-23; Agent Overview Report, ECF No. 150-24 (indicating background check revealed "no [d]erogatory information"). The USSS conducted an updated background check for the period covering 2008-2010 and found no derogatory information. July 15, 2011 Report, ECF No. 150-25.[18]

Plaintiff testified that she never told any employee of the USA about Kerns' misconduct prior to April 2011. Pl.'s Dep. 88, 139, 164, 166. Those who worked with Kerns also testified they were not aware of Kerns' alleged misconduct until April 2011. The USA also proffers testimony from those who worked with Kerns—including Iris Jolliff, who was the acting supervisor at the time of the incident—who testified that they were unaware of Kerns' alleged conduct until April 2011. Johnson Statement 2, ECF No. 150-3 (noting he did not know of Kerns' and Plaintiff's "improper relationship" until he was told in April 2011, nor did he notice Kerns communicating with Plaintiff in any inappropriate manner); Jolliff Statement 2, ECF No. 150-27 (noting she did not learn of Kerns' actions until April 2011); *see also* Jolliff Dep. at 33-34:1-16, ECF No. 150-31. Upon learning about the incident, the USA took prompt action to remove Kerns from the workplace and suspended his Top Secret Security Clearance and building access. *See* RAIC Griffin's Apr. 19, 2011 Mem., ECF No. 150-17 (detailing actions taken, including taking government-issued property from Kerns, upon learning of Kerns' behavior); Apr. 18-19, 2011 email chain regarding revocation of Kerns' Top Secret Security Clearance).

In addition, USSS employees who worked with Kerns testified they had no knowledge of Kerns' alleged problems with alcohol or 'womanizing' during his employment. Jolliff Dep. 59

---

[18] The court notes the updated security review covered September 2, 2008 through July 15, 2010 and was signed by the report-maker on July 15, 2010. ECF No. 150-25. The report was not signed by an approving "Division Chief" until July 15, 2011. *Id.*

(noting she was unaware of anyone calling Kerns a "ladies['] man or a womanizer"); Andrew Cole[19] Dep. 54-55, ECF No. 150-28 (noting he did not "know, suspect, or notice" any substance abuse by Kerns and Kerns did not seem to have an issue); Johnson Dep. 57-58, 60, ECF No. 150-4 (testifying he was unaware of any problem Kerns may have had with alcohol or other substances, nor was he aware of any marital difficulties or extra-marital affairs).

The USA also argues the record contains no facts indicating it "should have known" that Kerns' employment would pose an unreasonable risk of harm to anyone. Def.'s Mem. 14-15. Relating specifically to the case Kerns was investigating concerning Plaintiff, the USA points out that Kerns opened his criminal case file regarding Plaintiff in the GRO on January 28, 2010 or January 29, 2010. GRO New Case Number Request Form, ECF No. 9. Kerns submitted his initial case report to his supervisor May 26, 2010, which was within the 120-day time frame for submission of such a report. Case Report, ECF No. 150-10; USSS Policy INV-35, ECF No. 150-30 (indicating initial and routine case investigation reports are to be issued within 120 days). Kerns' report includes the December 3, 2009 interview he and Johnson conducted; however, he does not include any of his later contacts with Plaintiff in this report. The USA also submits it did not have access to the contents of any of the communications between Kerns and Plaintiff through 2010. In her deposition, Plaintiff indicated she and Kerns never exchanged emails. Pl.'s Dep. 90. Records indicate that Blackberry devices issued to USSS agents were not capable of sending or receiving text messages throughout the period at issue. *See* Decl. of USSS Information Technology Manager Russell Griffith, ECF No. 150-29.

The USA presents evidence that it was not unusual for agents such as Kerns to work out of the office during work hours. *See* Johnson Dep. 20-21. Accordingly, that Kerns drove to

---

[19] The record does not detail Cole's role, other than his being a USSS employee. The court's independent review of the available portions of Cole's deposition transcript indicate he was a USSS agent who worked in the GRO at some point and briefly shared office space with Kerns. Cole Dep. 54, 56.

Greenwood during business hours to meet Plaintiff would not be unusual and could have occurred without the knowledge, involvement, or approval of any of Kerns' USSS colleagues.

In response to the USA's argument, Plaintiff submits genuine issues of material fact exist as to whether the USA knew or should have known of a reason to control Kerns. Pl.'s Mem. 19. In defending against this Motion for Summary Judgment, though, Plaintiff looks only to "facts [alleged] throughout her complaint that indicate the Government and its employees had actual or constructive knowledge of Kerns' actions and the related constitutional violations and federal tort claims." Pl.'s Mem. 19.[20]

Plaintiff then sets out several pages of facts as alleged in her Amended Complaint, including the following:

- Plaintiff was taken to the GRO where she was "criminally processed, fingerprinted, and photographed." Pl.'s Mem. 19 (*citing* Am. Compl. ¶ 14);

- Kerns began harassing Plaintiff using his government-issued cell phone Pl.'s Mem. 20 (*citing* Am. Compl. ¶ 16);

- Facilitated by the use of a government-owned vehicle, Kerns sexually assaulted Plaintiff during regular duty hours *id.* (*citing* Am. Compl.¶ 17);

- Kerns used his firearm and position of authority to force himself on Plaintiff and rape her in his supervisor's office (*id.* at 20-21);

- Kerns "inferred [sic] that his supervisor had actual knowledge of the misconduct, stating that had his supervisor (John Doe) been present, he 'would have tried to grab you first.'" *Id.* at 21;

- The USA and its employees were "all aware of policies which facilitated Kerns' harassment and sexual assault of Plaintiff [,]" and these policies "are widespread, as indicated by Kerns' assertion that his supervisor or bosses also participated in similar sexual misconduct." *Id.*;

- These "unwritten policies also served to provide government agents with the unfettered opportunity to mislead, harass, and criminally violate individual rights by largely undermining promulgated policies and procedures as well as federal criminal procedure and Due Process." *Id.;* and

---

[20] No constitutional claims remain in this litigation. *See* Order.

- These "unwritten policies, either actually or constructively known to the Government, created a pervasive and unreasonable risk of harm suffered by Plaintiff." *Id.*

Plaintiff argues that it is "reasonable to infer that their supervisor [whom Plaintiff posits was RAC White] had either actual or constructive knowledge of his subordinates' actions, as is alleged in [her] complaint." Pl.'s Mem. 20. Further, Plaintiff submits Kerns' "constant telephone calls to a suspect and his disappearance to drive to Plaintiff's hometown during regular duty hours indicates that the supervisor and [Kerns'] partner Johnson (at the very least) should have known of Kerns' conduct." *Id.*

Importantly, in this argument Plaintiff cites only to her Amended Complaint to support her allegations and argues the USA has "failed to provide any rebuttal evidence that contradicts [her] extremely detailed facts set forth in her original complaint." Pl.'s Mem. 19.[21] Plaintiff ends this portion of her argument by indicating she will "offer additional testimony as to the facts and as to expert opinion testimony to assist the court in reaching its judgment." *Id.* at 21.

With this argument, Plaintiff fundamentally misstates the parties' responsibilities and the court's standard of review when considering a summary judgment motion. Plaintiff is not entitled to rest only on her pleadings to support factual matters she claims are in dispute. As the United States Supreme Court noted in *Celotex*, Rule 56 "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" 477 U.S. at 324 (quoting excerpts of a prior version of Fed. R. Civ. P. 56). All that is required is that "sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson*,

---

[21] Plaintiff does attach some record evidence to her brief; however, she refers to none of it in discussing the supervisory-liability claims. Nonetheless, the court has considered all competent evidence proffered by Plaintiff.

477 U.S. at 249. "Mere unsupported speculation . . . is not enough to defeat a summary judgment motion." *Ennis,* 53 F.3d at 62.

Plaintiff argues summary judgment would be "particularly inappropriate" in an FTCA matter in which the judge is the factfinder and the "question is whether particular acts constitute negligence." Pl.'s Mem. 21 (citing *Pierce v. Ford Motor Co.*, 190 F.2d 910, 915 (4th Cir. 1951)). *Pierce* did not involve any governmental entity, and the court does not read *Pierce* to stand for the proposition as stated by Plaintiff. She also cites *Hawkins v. Southern Railway Co.*, 45 F.R.D. 459, 460 (D.S.C. 1968), which indicates "[s]ummary judgment will not usually be feasible in negligence cases, where the standard of the reasonable man must be applied to conflicting testimony." Although Plaintiff correctly quotes the 1968 decision, *Hawkins* is not applicable in this case because "conflicting testimony" has not been proffered. On the one hand, the USA has supported its arguments with myriad citations to deposition testimony, statements of witnesses with knowledge, and exhibits discovered in this matter. On the other hand, Plaintiff rests almost entirely on her Amended Complaint and several inferences she propounds in her brief. Her pleadings are not sufficient to create genuine issues of material fact. Rule 56 requires more of a nonmoving party. Plaintiff's failure to provide testimony or other appropriate evidence to support her pleaded allegations cannot later be remedied "[a]t trial," as Plaintiff suggests she might do. Pl.'s Mem. 21. Accordingly, to the extent the district court determines it has jurisdiction to consider Plaintiff's claims for negligent hiring, supervision, and retention, summary judgment should be granted.

In any event, the undersigned has reviewed all record evidence and any permissible inferences in the light most favorable to Plaintiff. The recommended result remains the same. Even assuming, *arguendo*, that Plaintiff's assertions concerning whether she was *Mirandized* at the initial interview and whether she believed she had been arrested at that time, Plaintiff has not

created a genuine issue of material fact as to her claims of negligent hiring, supervision, or retention. Johnson, who was also present on December 3, 2009, recalled that Plaintiff was properly *Mirandized*. Further, Johnson was aware of the procedural sequence of events in cases such as Plaintiff's embezzlement charges. Nothing in the record supports a claim that he "knew or should have known" of a need to control Kerns at that time. Plaintiff also argues Kerns' supervisor, Jolliff, "should have known Plaintiff was not properly warned" when she saw the case-opening memo in late January 2010. Pl.'s Mem. 7. Again, Jolliff was familiar with the procedural sequence. The January 29, 2010 New Case Number Request Form provides very little information other than blanks for the title and type of case being opened. *See* ECF No. 152-12. Neither this form nor other record evidence provides evidence sufficient to create a genuine issue of material fact as to Plaintiff's claim of negligent hiring/supervision/retention.

The court also considers Plaintiff's claim that Kerns told her at the time of her assault that "it was a good thing that [his] boss wasn't here because he would have tried to grab [Plaintiff] first." Though denied by Kerns, the court assumes for purposes of this Motion that Kerns did make such a statement. As an initial point, the court notes that Kerns' "boss" as of March 2010, RAIC Jolliff, is female, making it unclear to which USSS "boss" Plaintiff was referring.[22]

Apparently focusing on this statement alone, Plaintiff makes the following argument that there were unwritten policies that facilitated Kerns' behavior towards her:

> Further, Plaintiff has alleged that the Government and its employees were all aware of policies which facilitated Kerns' harassment and sexual assault of Plaintiff. . . . These policies are widespread, as indicated by Kerns' assertion that his supervisor or bosses also participated in similar sexual misconduct. *Id.*

---

[22] In her memorandum, Plaintiff submits the supervisor to whom Kerns was referring on March 18, 2010, "was discovered by Plaintiff's attorneys to be Supervisor/RAC Darren White who was conspicuously transferred out of the country and then retired during this incident." Pl.'s Mem. 20. Plaintiff provides no citation for this assertion. The USA submits that no record evidence supports this point. Def.'s Reply 7. Plaintiff's argument that her counsel "discovered" this to be White, without more of a foundation, will not be considered herein. In any event, even if the "boss" is considered to have been White, it does not change the court's analysis.

> [referring back to Am. Compl. ¶ 21] The unwritten policies also served to provide government agents with the unfettered opportunity to mislead, harass, and criminally violate individual rights by largely undermining properly promulgated policies and procedures as well as federal criminal procedure and Due Process. Such unwritten policies, either actually or constructively known to the Government, created a pervasive and unreasonable risk of harm suffered by Plaintiff.

Pl.'s Mem. 20-21. Plaintiff contends that, "[o]ther than the broad and self-serving assertions in their Motion, the government has failed to provide any rebuttal evidence that contradicts Plaintiff's extremely detailed facts set forth in her original complaint." Pl.'s Mem. 20.

Again, Plaintiff is reminded that, at the summary-judgment stage, she must provide more than "detailed" facts averred in her pleadings. Further, when considering Plaintiff's claims brought pursuant to 42 U.S.C. § 1983 at the motion-to-dismiss stage, the undersigned found Plaintiff had not adequately pleaded facts sufficient to support inferences concerning "unwritten policies." *See* R&R at 20, *adopted in relevant part (without objection)* by Order 3 n.4. The suggested result remains the same at this juncture. Although the parties participated in discovery, Plaintiff does not now offer additional information to support her claim regarding "unwritten" policies permitting improper conduct by agents. It is too far of a stretch and an impermissible inference to draw from Kerns' alleged March 18, 2010 statement about his boss that the GRO had "unwritten policies" that tacitly permitted the agents to engage in improper conduct existed or that anyone with the USSS had actual or constructive knowledge of any such "unwritten policies." As the Fourth Circuit noted in *Othentec Ltd. v. Phelan*, 526 F.3d 135, 140 (4th Cir. 2008), a "nonmoving party 'cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another.' *Beale v. Hardy,* 769 F.2d 213, 214 (4th Cir. 1985). Rather, a nonmoving party must produce some evidence (more than a 'scintilla') 'upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed.' *Anderson,* 477 U.S. at 251 (quoting *Improvement Co. v.*

*Munson,* 81 U.S. 442 (1871)).” In addition, several USSS agents who worked at the GRO in February 2010 have stated they were not aware of any such “unwritten policy” and had no constructive or actual knowledge of such a culture or of any of Kerns’ actions. *E.g.* Cole Dep. 54-55, Johnson Dep. 57-58, 60.

Plaintiff has not presented sufficient evidence from which a factfinder could find the USA responsible under the supervisory-liability cause of action. Summary judgment is appropriate.

B.  Negligence claim

In addition to the supervisory-liability claims already discussed,[23] Plaintiff brings a separate negligence claim. Am. Compl. ¶¶ 74-83; *see* Order 8-9. The gist of Plaintiff’s remaining negligence claim is that the USA, through actions of its employees other than Kerns, breached a duty to Plaintiff by failing to follow proper federal and USSS procedures and policies.[24] In particular, Plaintiff focuses on her claim that she was not properly *Mirandized* before being interviewed on December 3, 2009, and that the USA did not comply with the requirements of Federal Rule of Criminal Procedure 5 that day. Plaintiff’s theory seems to be that she was arrested on December 3, 2009, thereby triggering constitutional rights concomitant with an arrest and custodial interrogation. She seems to claim her being questioned and taken to the GRO for processing on December 3, 2009, meant that she had been arrested. She submits the USA’s failure to then present her to a federal magistrate judge “without undue delay” after her arrest breached a duty owed to her. She then submits that breach proximately caused her to be damaged by Kerns’ later acts. *See* Pl.’s Mem. 28-30.

Under the FTCA, the court looks to the substantive tort law of the state “where the act or omission occurred.” 28 U.S.C. § 1346(b)(1). To recover in a negligence claim under South

---

[23] Both parties refer back to their arguments regarding negligent hiring/supervision/retention to the extent the negligence action seeks relief of that nature. Defs.’ Mem. 23-24, Pl.’s Mem. 32.

[24] To the extent a similar argument is made against Kerns, it is discussed in the next section.

Carolina law, "a plaintiff must prove the following three elements: (1) a duty of care owed by defendant to plaintiff; (2) breach of that duty by a negligent act or omission; and (3) damage proximately resulting from the breach of duty." *Bloom v. Ravoira*, 529 S.E.2d 710, 712 (S.C. 2000). South Carolina common law does not impose a general duty to control the conduct of another, but the courts recognize five exceptions to the general rule, finding such a duty exists: (1) where the defendant has a special relationship to the victim; (2) where the defendant has a special relationship to the injurer; (3) where the defendant voluntarily undertakes a duty; (4) where the defendant negligently or intentionally creates the risk; and, (5) where a statute imposes a duty on the defendant. The court must determine, as a matter of law, whether the law recognizes a particular duty. If there is no duty, then the defendant in a negligence action is entitled to a judgment as a matter of law. *Madison ex rel. Bryant v. Babcock Ctr., Inc.*, 638 S.E.2d 650, 656 (S.C. 2006) (internal citations omitted).

Plaintiff does not plainly explain what the source of the USA's duty to control Kerns would be or how this claim effectively is different from the supervisory-liability claims already discussed. She does indicate the USA "took on the task to detain and arrest criminal defendants, having accepted the duty of performing that task with due care. However, the Government failed to offer protection to female arrestees against substantial risk of harm, such as that perpetrated by Defendant Kerns." Pl.'s Mem. 28. She cites several cases in support of her claim that the USA assumed a duty based on a special relationship between the plaintiff and the USA. *See* Pl.'s Mem. 29-30.

For example, in *Rogers v. United States*, 397 F.2d 12 (4th Cir. 1968), the court found the U.S. Marshal may have assumed a duty toward a 17-year-old probationer. After Rogers was placed on probation after his criminal trial, the court ordered the marshal to transport Rogers home. Transportation was not available until the following day. Rogers accepted an offer to

spend the night at the home of an individual he had met while being detained at a local jail as he awaited trial. That individual tortured Rogers that night. The court remanded for further consideration of whether the marshal had assumed a duty to Rogers. If such a duty was found to exist, consideration of whether the duty was breached would include determining whether the marshal had knowledge of the third-party perpetrator's "unsavory reputation." 397 F.2d at 14-15. Plaintiff also cites *Sheridan v. United States*, 487 U.S. 392 (1988) for the general proposition that a plaintiff "may proceed against the United States in some cases in which the plaintiff's injuries occur from an assault or battery." Pl.'s Mem. 29. In *Sheridan*, the Court considered whether the intentional-tort exception to the FTCA shielded the USA from potential liability for the actions of an intoxicated off-duty serviceman. Other servicemen had attempted to assist him at the government-run hospital, but, upon seeing a firearm, released him. He later fired shots at the plaintiff's automobile. The Court found liability was possible, focusing not on the fact that the intentional tortfeasor was a government employee but on the fact that, by voluntarily enacting regulations prohibiting firearms on base and voluntarily trying to assist the obviously intoxicated serviceman, the government had undertaken a duty. 487 U.S. at 401-02. The matter was remanded for further proceedings and, under Maryland law, the Fourth Circuit affirmed the district court's determination that the regulations did not create a duty. *Sheridan v. United States*, 969 F.2d 72, 74-75 (4th Cir. 1992).

Tellingly, Plaintiff cites no cases imposing FTCA liability on the government for allegedly negligent acts based on the undertaking or assumption of a duty of due care in the context of a suspect of a federal criminal investigation, or a federal arrestee, outside of the negligent hiring/supervision/retention arena discussed earlier in this Report. As discussed above, those negligence-based claims are either excepted from FTCA consideration by the discretionary-act exception or, if considered on the merits, not viable. *See* discussion, *supra*.

Plaintiff submits there are issues of fact regarding whether she was read her *Miranda* rights on December 3, 2009, and whether she was actually arrested or was under the custodial control of the USSS at that time. The court notes that the statement Plaintiff signed, although not using the word "*Miranda*," indicates she had been made aware of her rights and chose to make the statement anyway. Pl.'s Dec. 3, 2009 Statement 1, ECF No. 150-5. Even if she had not been *Mirandized*, the remedy for a perceived *Miranda* violation is the exclusion of such statements at trial. *See United States v. Patane*, 542 U.S. 630, 641-42 (2004) ("police do not violate a suspect's constitutional rights (or the *Miranda* rule) by negligent or even deliberate failures to provide the suspect with the full panoply of warnings prescribed by *Miranda*. Potential violations occur, if at all, only upon the admission of unwarned statements into evidence at trial.").

Regarding Plaintiff's belief that she was "in custody" or actually "arrested" on December 3, 2009, the court notes as an initial matter that Plaintiff's subjective belief that she had been arrested or was not free to leave at any time is not, in and of itself, determinative of whether she was in a custodial situation. As the Fourth Circuit noted in *Davis v. Allsbrooks*, 778 F.2d 168, 171 (4th Cir. 1985), the "'ultimate inquiry'" in determining whether a suspect was in a custodial situation "does not turn on the subjective evaluation of the situation by the defendant or the police officers; instead, the test is an objective one." The "'only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation.'" 778 F.2d at 171 (quoting *Berkemer v. McCarty,* 468 U.S. 420, 442 (1984)). "Custody does not result merely because an individual is questioned in a 'coercive environment,' [*Oregon v.*] *Mathiason,* 429 U.S. [492], 495, [(1977),] or is the 'focus' of a criminal investigation. *Beckwith [v. United States],* 425 U.S. [341], 349 [(1976)]." Here, it is undisputed that Plaintiff was driven back to her personal vehicle and permitted to return home on the same day she was questioned. It is difficult

to imagine a reasonable person would believe she was in custody or had been arrested under those circumstances.

Even so, assuming for argument's sake she was "under arrest" on December 3, 2009, but not taken to see a United States Magistrate Judge "without unnecessary delay" pursuant to Rule 5, the court is aware of no precedent permitting FTCA negligence liability for such failure. As the USA noted, FRCP 5, like the *Miranda* rule, is a procedural safeguard, intended to "prevent administrative dete[n]tion without probable cause and to reduce the opportunity for third-degree practices." *United States v. Mendoza*, 473 F.2d 697, 702 (5th Cir. 1973). Further, the remedy for any Rule 5 violation is the suppression of prejudicial statements given by a suspect before being presented to a magistrate judge. *See e.g., United States v. Savchenko*, 201 F.R.D. 503, 506 (S.D. Cal. 2001). Here, Plaintiff does not allege the government lacked probable case, nor does the evidence indicate she was subjected to the "third degree." *Cf. Conrad v. United States*, 447 F.3d 760, 767 (9th Cir. 2006) (finding timing of presentment under Rule 5 subject to discretion of agent and barred by discretionary-function exception to FTCA in malicious prosecution claim brought by plaintiff who had been unsuccessfully prosecuted by IRS). The undersigned is of the opinion that Plaintiff's claim the USA's December 3, 2009 actions or inactions were negligent should fail as a matter of law.

In any event, the undersigned agrees with the USA that Plaintiff's negligence claim also fails because Plaintiff's claimed injuries in January 2010 (when Kerns went to Greenwood) and in March 2010 (when Kerns and Plaintiff had a sexual encounter) were not proximately caused by any negligence that might have taken place during the December 3, 2009 encounter between Plaintiff, Johnson, and Kerns. *See* Def.'s Mem. 22-23. As the USA noted, proximate cause requires more than a bare but-for analysis. *See* Restatement (Second) of Torts, § 431, cmt. (a) ("[I]t is not enough that the harm would not have occurred had the actor not been negligent.").

Rather, the complained-of act/omission must have been a "substantial factor" in bringing about the harm, meaning that "the defendant's conduct has such an effect in producing the harm as to lead reasonable men to regard it as a cause." *Id.* A plaintiff must prove that her injury was caused by the actionable negligence of the defendant. *Hunter v. Dixie Home Stores,* 101 S.E.2d 262 (S.C. 1967).

Plaintiff submits that as "a proximate result" of the failure to follow procedures and present Plaintiff to a magistrate judge on December 3, 2009, Kerns had the "unfettered opportunity to mislead, sexually harass, then criminally violate Plaintiff's civil rights for more than eight (8) months and do so with no apparent supervisory oversight of his egregious and eventual criminal misconduct." Am. Compl. ¶ 26 (in context of the failure of Kerns and Johnson to comply with Rule 5); *see also* Am. Compl. ¶ 83 (in context of failure to train and supervise).

To support her argument that negligence imputable to the government proximately caused her injuries, Plaintiff relies in large part on "the unwritten policies in question" and the government's deliberate indifference or tacit authorization of the use of "harassment and other tactics which placed Plaintiff and others at high risk of violations of their constitutional rights." Pl.'s Mem. 32. Looking to paragraphs in her Amended Complaint focused on the knowledge of Kerns' supervisors as to his prior conduct, Plaintiff submits that without "these policies," Kerns would not have had the opportunity or tools to prey upon Plaintiff and others. *Id.* Without citing to the record, Plaintiff continues by indicating such policies were "widely recognized within the USSS and foster an environment of sexual misconduct." *Id.*

Plaintiff submits these policies and the general environment establish a causal link between "Defendant's action/inaction and the harm actually suffered by Plaintiff." Pl.'s Mem. 32. Had she been presented to a magistrate judge when allegedly "under custodial arrest" on December 3, 2009, she would have been assigned defense counsel at that time. "Under those

circumstances," Plaintiff argues, "Kerns would never [have] had the opportunity to take advantage of Plaintiff." *Id.* at 32-33.

As an initial matter, the undersigned notes that Plaintiff's argument seems to be one of negligent supervision/retention rather than an independent negligence claim. To the extent Plaintiff actually brings a separate claim of negligence based on actions/inactions of December 3, 2009, it should fail. As noted above, Plaintiff has not set forth sufficient evidence of the "policies" that somehow made the atmosphere ripe for Kerns' later actions toward Plaintiff. Further, the references to such "policies" were included in her Amended Complaint more in the context of attempting to establish negligent supervision violations under *Bivens*.[25] Those claims have already been dismissed. Further, Plaintiff's argument that Kerns would have been unable to take advantage of her if she had been assigned defense counsel in December 2009 is purely conjectural.

Summary judgment is appropriate as to Plaintiff's separate negligence claim against the USA.

C.  USA's Potential Vicarious Liability for Acts of Defendant Kerns

The FTCA provides that the United States shall be liable "for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government *while acting within the scope of his office or employment*, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." *See* 28 U.S.C. § 1346(b)(1) (emphasis added).

---

[25] *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971).

a)  Events of December 3, 2009

Regarding the events of December 3, 2009, the USA and Plaintiff agree that Kerns (and Johnson) were operating within the scope of their employment. *See* Def.'s Mem. 19, Pl.'s Mem. 25. To the extent Plaintiff brings a negligence-based claim concerning the December 3, 2009 actions of Kerns and Johnson (as opposed to the actions or inactions of other USSS personnel), such a claim should fail for the same reason the negligence claim brought against other USSS personnel fail. Even assuming, *arguendo*, that Kerns and Johnson failed to *Mirandize* Plaintiff and otherwise failed to follow Rule 5 procedures or other policies at that time, there was no *duty* between Plaintiff and the USA that could have been breached. Even if such a duty existed, the alleged breaches of the duty are too attenuated from December 3, 2009 to satisfy the proximate-cause element of a negligence claim. *See supra*.

b)  Post-December 3, 2009 events/scope of employment issue

The USA contends it is not liable in tort for Kerns' actions toward Plaintiff after December 3, 2009, because those actions were taken outside the scope of his employment. Def.'s Mem. 15-19. Plaintiff submits Kerns continued to act in the scope of his employment, arguing the question of whether other actions were outside the scope of employment is one for the factfinder. Pl.'s Mem. 21-26. The court denied the USA's motion to dismiss claims as to acts of Kerns as being outside the scope of his employment, finding further factual development was merited. *See* Order 4-5, R&R 26-29. The parties have now completed discovery, and the USA has accepted the court's invitation to pursue summary judgment on this same issue of law. *See* Order 5, R&R 29. Accordingly, the court herein considers the USA's argument that it is not liable for the tortious actions of Kerns under the theory that a master is responsible for the actions of its servants pursuant to respondeat superior or vicarious liability. *See* Defs.' Mem. 16-19. In considering this issue, South Carolina law applies. *See* 28 U.S.C. § 1346(b)(1).

In South Carolina, an employer is liable for the torts of his employee when the employee commits the act in question while acting "about his master's business and acting within the scope of his employment." *Lane v. Modern Music, Inc.*, 136 S.E.2d 713, 716 (S.C. 1964). "An act is within the scope of a servant's employment where reasonably necessary to accomplish the purpose of his employment and is in furtherance of the master's business." *Id.* However, an employee's act "done to effect some independent purpose of his own and not with reference to the service in which he is employed, or while he is acting as his own master for the time being, is not within the scope of employment so as to render the master liable." *Id.* When an employee "steps aside" from the employer's business "for some purpose wholly disconnected with his employment, the relation of master and servant is temporarily suspended; and this is so no matter how short the time, and the master is not liable for his acts during such time." *Id. See also Gainey v. Kingston Plantation*, C/A 4:06-3373-RBH, 2008 WL 706916 (D.S.C. Mar. 14, 2008) (granting summary judgment to employer, finding allegedly tortious assault of plaintiff done outside scope of employee's employment).

In situations in which the employee's "deviation from the course of his other employment is very marked and unusual, the matter may be determined by the court rather than by submitting the question to the [fact-finder]." *Tucker v. U.S.*, 385 F. Supp. 717, 722 (D.S.C. 1974) (citations omitted). *See also Carroll v. Beard-Laney, Inc.*, 35 S.E.2d 425, 427 (S.C. 1945) ("'Whether the extent of [the employee's] departure from the scope of his employment, or the area of his service was so unreasonable as to make his act of deviation and independent journey of his own, rather than a mere detour or one incidental to his employment, is a question of degree which depends on the facts of the case and is a matter for the determination of the jury, unless the deviation is so great, or the conduct so extreme, as to take the servant outside the scope of his employment and

make his conduct a complete departure from the business of the master.'") (quoting 35 Am. Jur. 991).

Here, the USA argues that, even considering all facts in the light most favorable to Plaintiff, the court can still determine as a matter of law that Kerns was not acting within the course and scope of his employment in January or March 2010. Def.'s Mem. 16. Defendant submits that Kerns' deviations from his official duties were extreme and he was acting only in his own interest as demonstrated by, *inter alia*, his comments to Plaintiff in January 2010 when they were kissing in her vehicle and on the evening of March 18, 2010. *Id.* at 16-19. Plaintiff argues the question of whether Kerns was acting within the course and scope of his employment is one of fact. She contends Kerns continued to discuss the government's case against her and used government property at times, making the question a factual one of "degree" of deviation. Pl.'s Mem. 22-26.

Having reviewed the parties' arguments and applicable case law, the undersigned is of the opinion that Kerns' actions were outside the scope of his employment as a matter of law, making summary judgment appropriate. Although Kerns drove to Greenwood in January 2010 to see Plaintiff in his government-owned vehicle, when they met at the hospital parking lot, Plaintiff testified in deposition that Kerns then got into her vehicle and she drove them to the Ninety-Six Historical Park. The decision as to where they would go was Plaintiff's. Pl.'s Dep. 84. Plaintiff indicated in her written statement that, while driving to the park they discussed their respective marriages and her case. Pl.'s May 18, 2011 Statement 1-2. She noted that Kerns had "always promised" her he would help her with her case as long as she trusted him. *Id.* at 2. When they arrived at the park, Kerns kissed Plaintiff and told her "he could lose his job if anyone found out about this and that he was trying to help [her]." *Id.*

On March 18, 2010, Plaintiff noted Kerns had called her "all day" noting his wife was out of town and that she should meet him in Greenville for a drink. Pl.'s May 18, 2011 Statement 2. When she arrived, although Kerns wanted to go to his office, she insisted they go to a bar because she believed she had met him for drinks. *Id.* at 3. While at the bar, Kerns made a sexually explicit statement to her. They then went to the GRO, although Plaintiff indicated she "never dreamed" he was taking her there to try and have sex. *Id.* According to Plaintiff, Kerns then sexually assaulted her in the GRO. After the assault, Kerns told Plaintiff that "if they found out that [the sexual liaison] had happened, and he did that, that he would lose his job, and that the bank was trying to go back and charge [her] with all the money that [she] could have taken, and that, you know, if [she] didn't—if he wasn't there, he was the only one that was on [Plaintiff's] side." Pl.'s Dep. 110-11.

In responding to Defendant's Motion, Plaintiff argues Kerns was acting within the scope of his employment during their January 2010 encounter because their acquaintance derived from her being investigated by the USSS, Kerns drove to Greenwood in a government vehicle, and he often used a government-issued phone to contact Plaintiff. Pl.'s Mem. 25-26. In discussing the events of March 18, 2010, Plaintiff indicates Kerns had called her during regular business hours and "ordered her to come to Greenville for what he again claimed were issues related to the investigation[,]" claims going inside the GRO that evening was also "related to the investigation," and notes Kerns' comment to her that "inferred" his supervisor's office had been "the site of other such sexual assaults." Pl.'s Mem. 26 (citing no record evidence).

Plaintiff argues these facts are distinguishable from those in the *Lane* and *Gainey* cases on which the USA has relied. Pl.'s Mem. 24-25. In *Lane*, the court noted an employee was not acting within the scope of employment when the employee's actions were undertaken "to effect some independent purpose of his own and not with reference to the service in which he is

employed, or while he is acting as his own master for the time being" and when an employee "steps aside from the master's [employer's] business for some purpose wholly unconnected with his employment, the relation of master and servant is temporarily suspended; and this is so no matter how short the time, and the master is not liable for his acts during such time." *Lane*, 136 S.E.2d at 716. In *Lane*, an employee responsible for installing music machines in establishments, repairing the machines, and collecting money was found not to have been acting within the scope of his employment when he placed a "mongoose" in an establishment as a practical joke. The mongoose device frightened and injured a patron. The court found the employer was not responsible for the patron's injuries because the only reasonable inference was that the employee used the mongoose for his own purposes and not to further the business of his employer. *Id.* at 717.

In *Gainey*, the court granted summary judgment to the design-firm employer, finding an employee of a design firm who was performing some installation work at a hotel was not acting in his employer's interests when he asked the plaintiff for some towels, grabbed her, and tried to pull her into the hotel unit where he had been working. *Gainey*, 2008 WL 706916. Plaintiff, who was a hotel housekeeper, submitted that the employee's request for towels to clean up some paint he had on the floor likely was within the scope of the worker's employment. Nonetheless, the plaintiff's complaint revolved around the employee's physical actions toward plaintiff, not his request for some towels. *Id.* The court found the worker had "momentarily stepped away" from his employer's business and the alleged act of grabbing the plaintiff was not "reasonably necessary to accomplish the purpose of his employment." *Id.*

Plaintiff submits that, unlike the employee-actors in *Lane* and *Gainey,* "it can be inferred from the continued harassment of Plaintiff that Kerns' actions were within the scope of his employment and his employer's interests." Pl.'s Mem. 26. She argues that Kerns "utilized his

employment as a law enforcement officer to facilitate his predatory deeds — his employment and his actions were intimately intertwined and a means by which the sexual assault and eventual rape took place." *Id.* Plaintiff submits that Kerns' "consistently intimidating and ultimately threatening and raping Plaintiff," ensured "that she would not have the wherewithal to defend her case while also carrying through with the master's business of securing a criminal prosecution." *Id.*

The undersigned finds Plaintiff's argument unavailing. While true that Kerns purported to be helping Plaintiff with her case (while at the same time pursuing a personal relationship), Kerns' comments to her that he would lose his job if anyone found out about their relationship suggest, if anything, that Kerns was working at cross-purposes with the government's objective of "securing a criminal prosecution." Kerns' statement to Plaintiff that she could receive a longer sentence if she "did not have him on [her] side," Pl.'s Dep. 182, does not lend itself to an inference that he was furthering the government's interests by engaging in a personal relationship with Plaintiff. When asked whether the March 18, 2010 sexual encounter was of benefit to the USSS, Plaintiff indicated there was "[n]one that [she] could see." Pl.'s Dep. 195. Rather, Plaintiff testified she believed those events "did harm" to the USSS. *Id.*

Similarly unavailing is *Crittenden v. Thompson-Walker, Co.*, 341 S.E.2d 385 (S.C. Ct. App. 1986), cited by Plaintiff. *See* Pl.'s Mem. 23 (citing *Crittenden*). In that case, the court found a contractor's foreman was acting within the scope of his employment when he severely beat a store owner until the owner agreed to pay a balance owed the contractor. Focusing on the fact that the foreman was attempting to collect a debt due his employer, the assault took place at the job site during regular hours, and the foreman was otherwise performing his usual duties, the court found there was sufficient evidence to submit to the jury the question of whether the foreman was acting "in furtherance of his master's business" for purposes of vicarious liability

even though the conduct itself fell outside the scope of employment. 341 S.E.2d at 387-88. Here, though, the evidence indicates Kerns was not trying to further the government's business through personal contact with Plaintiff. Rather, if anything, he was at odds with the government, noting that he was looking to somehow compromise Plaintiff's prosecution in exchange for sexual favors. That he was a government agent involved in the case against Plaintiff does not change that. *See Doe v. United States*, 769 F.2d 174, 175 (4th Cir. 1985) (affirming trial court's grant of motion to dismiss case in which Air Force Major who allegedly exposed himself and made sexual advances toward plaintiff during the course of counseling sessions "clearly was acting for his personal gratification rather than within the scope of his employment."); *see also Hamilton v. J.D. Davis,* 389 S.E.2d 297, 298–99 (S.C. Ct. App. 1990) (finding summary judgment was appropriate because there was no doubt that employee's "dumb stunt" that injured a third party was not performed in scope of employment even though he was at the location where "stunt" occurred to perform work for his employer).[26]

Because there is no evidence from which a factfinder could determine that Kerns' complained-of actions after December 3, 2009 were undertaken in the scope of his employment to benefit the USA, summary judgment should be granted as to Plaintiff's FTCA claims premised on such actions. Those claims include Plaintiff's outrage cause of action. *See* Order 7.

III.     Conclusion and Recommendation

Based on the foregoing, the undersigned recommends the following:

- The court lacks jurisdiction to consider Plaintiff's claims for supervisory liability raised in Count III ("FTCA") and to the extent they are raised in Count IX ("Negligence") as

---

[26] Plaintiff also argues the facts of this case are analogous to those in *Millbrook v. United States,* 133 S. Ct. 1441, 1443-44 (2013), in which it was determined that the USA could be found liable under the FTCA for a law enforcement officer's forcing plaintiff to perform oral sex against his will. However, in that case, the USA had certified the law enforcement officer was acting within the scope of his employment, and the Court expressly noted it made no decision on that issue. 133 S. Ct. at 1445 n.3.

they fall within the FTCA's discretionary-act exception; even if jurisdiction exists on such claims, the USA is entitled to judgment as a matter of law;

- The USA's Motion should be granted as to Count IX (Negligence); and

- The USA's Motion should be granted as to its claim that it is not vicariously liable for the actions of Kerns subsequent to December 3, 2009, because, as a matter of law, Kerns was not acting within the scope of his employment regarding Plaintiff's complained-of injuries.

In the event the district court adopts these recommendations, the only remaining claims for trial are those against Kerns.

IT IS SO RECOMMENDED.

October 9, 2015                                           Kaymani D. West
Florence, South Carolina                            United States Magistrate Judge

**The parties are directed to note the important information in the attached "Notice of Right to File Objections to Report and Recommendation."**