IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

| | | |
|---|---|---|
| Kristen Miles Anderson, | ) | |
| | ) | Civil Action No. 8:12-3203-TMC |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **ORDER** |
| | ) | |
| The United States of America and | ) | |
| Richard Kerns, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

This matter is before the court on a motion to dismiss, or in the alternative, motion for summary judgment filed by the United States of America ("United States"). (ECF No. 150). Kristen Miles Anderson ("Anderson") filed a response in opposition, and the United States filed a reply. (ECF Nos. 152, 153). In accordance with 28 U.S.C. § 636(b)(1) and Local Civil Rule 73.02, D.S.C., this matter was referred to a magistrate judge for pretrial handling. Before the court is the magistrate judge's Report and Recommendation ("Report"), recommending that the court grant the motion and dismiss the United States from this action. (ECF No. 157). Anderson has filed timely objections. (ECF No. 168). The United States has filed a reply to Anderson's objections. (ECF No. 175). On December 7, 2015, Anderson also filed a motion to amend the complaint, seeking to add a new defendant and a new claim. (ECF No. 179). On December 8, 2015, the court held a hearing on the motion filed by the United States.

The Report has no presumptive weight and the responsibility to make a final determination in this matter remains with this court. *See Mathews v. Weber*, 423 U.S. 261, 270–71 (1976). In making that determination, the court is charged with conducting a de novo review of those portions of the Report to which either party specifically objects. *See* 28 U.S.C. §

636(b)(1).  Then, the court may accept, reject, or modify the Report or recommit the matter to the magistrate judge.  *Id.*  In the absence of specific objections, this court is not required to provide an explanation for adopting the Report.  *See Camby v. Davis*, 718 F.2d 198, 199 (4th Cir. 1983).  Rather, "in the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation."  *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310, 315 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

## BACKGROUND

### I.       Factual Background

Anderson was a teller/manager at a SunTrust Bank ("SunTrust") in Greenville, South Carolina.  (ECF No. 37 at 4).  In November 2009, SunTrust's management and security team began an investigation into possible embezzlement at the branch where Anderson was employed.  (ECF No. 37 at 4).  SunTrust contacted the United States Secret Service ("USSS") to assist in the investigation.   (ECF No. 37 at 4).   On December 3, 2009, SunTrust's regional security investigators contacted Anderson and voiced their suspicion that she had embezzled the funds.  (ECF No. 37 at 4).  They directed her to come to the bank and to bring any funds in her possession.  (ECF No. 37 at 5).

At this meeting with bank investigators, Anderson returned approximately $35,000.00 in embezzled bank funds and made incriminating statements.  (ECF No. 37 at 5).  Immediately after making such statements, USSS agents Richard Kerns ("Kerns") and Gregory Johnson ("Johnson") entered the room and interviewed Anderson.  (ECF No. 37 at 5–6).  After the interviews, Anderson rode with Kerns and Johnson to the Greenville, South Carolina Resident Office of the Secret Service ("GRO") to have her photograph and fingerprints taken.  (ECF No.

37 at 6). She also wrote and signed a confession admitting to the embezzlement of bank funds. (ECF Nos. 168-8, 168-9).

That night, Kerns began a series of telephone calls to Anderson on his government-issued phone. (ECF No. 37 at 7). On January 13, 2010, Kerns called Anderson to say he wanted to meet with her to discuss her case. (ECF Nos. 150-8 at 1–2; 152 at 3; 168-41 at 8). Kerns met with Anderson in Greenwood, South Carolina (hereinafter, the "Greenwood Incident"). (ECF Nos. 150-8 at 1–2; 152 at 3; 168-41 at 8). Kerns entered Anderson's vehicle, and Anderson decided to drive to a nearby park where there would not be a "whole lot of people." (ECF Nos. 150-6 at 3; 152 at 3). During the drive, they discussed their respective marriages and her case. (ECF No. 150-8 at 2). Kerns told her that he would help her out and that he would get her probation. (ECF No. 150-8 at 2). Once at the park, they got out of the car, and Kerns allegedly forced Anderson to kiss him. (ECF No. 152-20). He told her that compliance with sexual demands would favorably impact the case against her. (ECF No. 152 at 3). They left shortly after the kiss because "someone from [Kern's] office had called, and he was supposed to be at a meeting, and he was late for it, and they were looking for him." (ECF No. 152-20). Anderson then drove Kerns back to his car and she went home. (ECF No. 152-20).

Although Kerns and Anderson subsequently talked on the phone, they did not see each other again until March 18, 2010, when Kerns called Anderson to tell her that his wife was out of town and that he wanted to meet her that night for drinks. (ECF No. 150-8 at 2). Anderson met Kerns in Greenville, South Carolina, and parked at a Holiday Inn a block away from the GRO (hereinafter, the "Greenville Incident"). (ECF No. 152-24). They went to a bar a block away from the GRO where they had a drink and stayed for about thirty minutes. (ECF No. 152-25). Anderson testified in her deposition that she was mad "because he told me it was about my case,

and then when I got there it wasn't about my case.  He would do that to me all the time."  (ECF No. 152-25).  While at the bar, Kerns made sexual advances towards Anderson.  (ECF No. 152-25).  She told him that she had to leave.  (ECF No. 152-25).  Kerns said he would walk her to her car, but first he needed to get papers from the GRO.  (ECF No. 152-25).  They entered the GRO at 11:38:47 p.m. (ECF No. 150-11).

Kerns showed Anderson his office and his boss's office.  (ECF No. 150-8 at 3).  Kerns kept telling Anderson that "he was on [her] side and all [she] had to do was trust him and he was going to make sure [she] didn't go to prison and that [she] got probation."  (ECF No. 150-8 at 3–4).  While in his boss's office, Kerns started to kiss Anderson, and they had intercourse.  (ECF No. 150-8 at 3–4).  At 12:35:59 a.m. on March 19, 2010, they left.  (ECF No. 150-8 at 4).

On May 26, 2010, Kerns submitted his first case status report to his GRO supervisor regarding the criminal investigation of Anderson.  (ECF No. 150-10).  The report did not include references to the Greenwood or Greenville Incidents, or that Kerns had been calling Anderson. (ECF No. 150-10).  A grand jury indicted Anderson on August 10, 2010, and she was formally arrested and arraigned on August 26, 2010.  (ECF No. 150-12).  Kerns submitted a second status report to his GRO supervisor on September 8, 2010.  (ECF No. 150-12).  The second status report did not mention the Greenwood or Greenville Incidents, or that Kerns had been calling Anderson.  (ECF No. 150-12).

On April 13, 2011, after pleading guilty in her criminal case, Anderson informed U.S. Probation Officer Robin Brown ("USPO Brown") of the incident.[1]    (ECF No. 150-13).  Anderson claimed that she decided to report the incident because Kerns "told her that he couldn't help her with her case."  (ECF No. 150-13 at 2).  Anderson had discussed the incident with her

_____
[1] Although the statement by the USPO Brown references April 14, 2011, the evidence shows that she became aware of the allegations on April 13, 2011.  In any event, this factual discrepancy in USPO Brown's statement is non-material.

defense attorney prior to informing USPO Brown.  (ECF Nos. 150-13 at 2; 150-14 at 2).  The Assistant United States Attorney ("AUSA") prosecuting Anderson's case was immediately made aware of the situation and informed his supervisor and Kerns.  (ECF No. 150-14).  Kerns told the AUSA that the claims were unfounded; however, Kerns later called the AUSA and told him that he was not entirely truthful with him, and that he was concerned that he had compromised the criminal case against Anderson.[2]  (ECF No. 150-14).  Thereafter, Anderson was sentenced to fifteen months' imprisonment, followed by five years' supervised release.

## II.      Procedural Background

Anderson filed a claim with the Office for General Counsel seeking damages for only the Greenville Incident, and the claim was denied.  (ECF No. 178).[3]  Anderson filed this case on November 6, 2012.  (ECF No. 1).  In her amended complaint, she asserts various claims based on alleged violations of her constitutional rights and tort claims against the United States, Kerns, Johnson, Thomas Griffin, Jr., Mark J. Sullivan, Secretary Janet Napolitano, and other defendants not yet named.  (ECF No. 37).

On April 15, 2013, the United States filed its first motion to dismiss and motion for summary judgment.   (ECF No. 52).   Notably, the United States did not argue that the discretionary-function exception applies to the supervisor-liability claim.  (ECF No. 52).  The court granted in part and denied in part that motion.  (ECF No. 84).  The court dismissed all of the defendants except Kerns and the United States.  (ECF No. 84).   The court found that

---

[2] On April 20, 2011, the Secret Service Office of Inspection and the Department of Homeland Security Office of Inspector General began an investigation into the incidents to determine whether Kerns should be criminally prosecuted for the incidents; Kerns was not prosecuted.  (ECF Nos. 150 at 7; 150-19; 150-20).

[3] The court notes that the claim form did not include any facts, or a sum certain, concerning the Greenwood Incident. (ECF No. 178); *see* 28 U.S.C. § 2401(b) (providing that each "tort claim against the United States" must be presented to the appropriate federal agency); *see also Ahmed v. United States*, 30 F.3d 514, 516–17 (4th Cir. 1994) (stating that to sufficiently present a claim, a plaintiff must provide notice that "'(1) is sufficient to enable the agency to investigate and (2) places a 'sum certain' value on her claim.'" (quoting *Adkins v. United States*, 896 F.2d 1324, 1326 (11th Cir. 1990))).

Anderson had alleged sufficient facts to survive a motion to dismiss for claims of vicarious liability and supervisory liability against the United States in her amended complaint and that these issues would be better resolved on a more-developed factual record.  (ECF No. 84 at 5).

### APPLICABLE LAW[4]

Under the federal rules, each pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  A motion to dismiss under Fed. R. Civ. P. 12(b)(1) examines whether the complaint fails to state facts upon which jurisdiction can be founded.  The burden of proving subject matter jurisdiction in response to a Rule 12(b)(1) motion to dismiss is on the plaintiff, the party asserting jurisdiction. *Richmond, Fredericksburg & Potomac R.R. v. United States,* 945 F.2d 765, 768 (4th Cir.1991). The court should grant the motion "only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." *Evans v. B.F. Perkins Co.,* 166 F.3d 642, 647 (4th Cir.1999) (internal quotation marks and citations omitted).

Summary judgment is appropriate if, after reviewing the entire record in a case, the court is satisfied that no genuine issues of material fact exist and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  An issue of fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the plaintiff.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  Issues of fact are "material" only if establishment of such facts might affect the outcome of the lawsuit under the governing substantive law.  *Id.*

---

[4] As to its non-discretionary function arguments, the United States labeled its motion as a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) and Fed. R. Civ. P. 56.  Because the parties presented the court with materials outside of the pleadings and the court considered those materials, the court, like the magistrate judge, will construe the motion pursuant to Fed. R. Civ. P. 56.  *See Gay v. Wall*, 761 F.2d 175, 177 (4th Cir. 1985) (stating that a court shall construe a motion to dismiss as a motion for summary judgment when "matters outside the pleadings are submitted with" the motion).

"The party moving for summary judgment has the [initial] burden of establishing that there is no genuine issue as to any material fact and that he is entitled to judgment as a matter of law." *Catawba Indian Tribe of S.C. v. South Carolina*, 978 F.2d 1334, 1339 (4th Cir. 1992). Thereafter, the party opposing summary judgment must come forth with "sufficient evidence supporting the claimed factual dispute," and cannot "rest upon the mere allegations or denials of his pleading." *Anderson*, 477 U.S. at 248 (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968)). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 247. "Although the court must draw all justifiable inferences in favor of the nonmoving party, the nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence." *Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013); *see also Catawba Indian Tribe of S.C.*, 978 F.2d at 1339 ("The non-moving party 'must do more than simply show that there is some metaphysical doubt as to the material facts.'" (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986))); *Williams v. Cerberonics, Inc.*, 871 F.2d 452, 459 (4th Cir. 1989) (stating that the plaintiff "presented no evidence to support her claim other than her own assertions" and set against the documentation, "no reasonable trier of fact could" find for her); *Ross v. Commc'ns Satellite Corp.*, 759 F.2d 355, 365 (4th Cir. 1985), *overruled on other grounds*, 490 U.S. 228 (1989) ("Genuineness means that the evidence must create fair doubt; wholly speculative assertions will not suffice."). In sum, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co*, 475 U.S. at 587 (*Cities Serv. Co.*, 391 U.S. at 289)).

# DISCUSSION

The United States has moved to dismiss the claims for negligent hiring, retention, and supervision for lack of subject matter jurisdiction.  (ECF No. 150 at 1).  The United States has also moved to dismiss the remaining FTCA claims because there is no dispute of material fact concerning the liability of the United States for Kerns's acts.  (ECF No. 150 at 1).

The magistrate judge recommended that the court grant the summary judgment motion filed by the United States.  (ECF No. 157).  The magistrate judge recommended dismissing the complaint insofar as it seeks to impose liability on the United States for negligent hiring, retention, and supervision because the claim is barred pursuant to the discretionary-function exception of the FTCA, and in addition, because no genuine issue of material fact exists as to whether the United States knew or should have known that employing Kerns created an unreasonable risk to the public.  (ECF No. 157 at 11–26).  The magistrate judge also recommended dismissing the negligence claim against the United States because Anderson fails to establish what stand-alone duty the United States owed to Anderson, and in any event, how a breach of a duty to *Mirandize*[5] Anderson is the proximate cause of her harm.  (ECF No. 157 at 26–32).  And finally, the magistrate judge recommended dismissal of the vicarious liability claims against the United States because Anderson failed to introduce genuine issues of material fact showing that Kerns was acting within the scope of employment during the incidents.  (ECF No. 157 at 32–39).  Anderson has objected to each portion of the Report, and the court will consider each in turn.  Initially, however, the court will consider Anderson's motion to amend her complaint.

---

[5] *Miranda v. Arizona*, 384 U.S. 436 (1966).

## I.  Motion to Amend

On the afternoon of December 7, 2015, the day before the hearing on the motion filed by the United States, Anderson filed a motion to amend her amended complaint to add a cause of action for abuse of process and an additional defendant, Iris Jolliff ("Jolliff").  (ECF No. 179). The substance of the motion consists of two short paragraphs, and the proposed amended complaint is not attached to the motion.  (ECF No. 179).

Generally, motions to amend a pleading are governed by Federal Rule of Civil Procedure 15(a).  Rule 15(a)(2) provides that "a party may amend its pleading only with the opposing party's written consent or the court's leave.  The court should freely give leave when justice so requires."  Fed. R. Civ. P. 15(a)(2).  Under Rule 15, a court should deny a motion to amend "only where it would be prejudicial, there has been bad faith, or the amendment would be futile." *Nourison Rug Corp. v. Parvizian*, 535 F.3d 295, 298 (4th Cir. 2008) (citing *HCMF Corp. v. Allen*, 238 F.3d 273, 276–77 (4th Cir. 2001)).

However, once a scheduling order has been entered and the time period to file amendments to the pleadings has expired, the party moving to amend must first satisfy Rule 16(b), which requires a movant to show "good cause" for the amendment.  *Id.* at 298; *see also O'Connell v. Hyatt Hotels of P.R.*, 357 F.3d 152, 154–55 (1st Cir. 2004) (noting that "Rule 16(b)'s 'good cause' standard, rather than Rule 15(a)'s 'freely given' standard, governs motions to amend filed after scheduling order deadlines").  Unlike Rule 15(a)'s standard, Rule 16(b)'s standard "focuses on the timeliness of the amendment and the reason for its tardy submission; the primary consideration is the diligence of the moving party."  *Montgomery v. Anne Arundel County, MD.*, 182 F. App'x 156, 162 (4th Cir. 2006).  "Good cause exists when a party's reasonable diligence before the expiration of the amendment deadline would not have resulted in

the discovery of the evidence supporting a proposed amendment." *Firemen's Ins. Co. of Washington D.C. v. Glen-Tree Investments, LLC*, No. 7:11-cv-59, 2012 WL 4191383, at *3 (E.D.N.C. Sept. 19, 2012) (citations omitted). Thus, "[t]he movant must demonstrate that despite his diligence he could not meet the original deadline or offer the amendment sooner." *In re Understanding Corp.*, No. 08-81398, 2009 WL 4059047, at *3 (Bankr. M.D.N.C. Nov. 19, 2009) (citations omitted). "If the movant satisfies Rule 16(b)'s 'good cause' standard, it must *then* pass the requirements for amendment under Rule 15(a*)." Dilmar Oil Co. v. Federated Mut. Ins. Co.*, 986 F. Supp. 959, 980 (D.S.C. 1997) (emphasis in original).

The court finds the motion to amend should be denied. Initially, Anderson failed to attach a copy of the proposed amended complaint to the motion. *See, e.g., Al-Haqq v. Stirling*, No. 2:14-098-TMC, 2014 WL 6749096, at *10 (D.S.C. Dec. 1, 2014) (stating that failing to attach a copy of the proposed complaint "is sufficient to deny the motion" to amend); *Wells v. Spartanburg Cty. Det. Ctr. Facility Employees*, No. 8:10-1490-CMC, 2010 WL 4853868, at *2 (D.S.C. Oct. 26, 2010) (magistrate judge) (same). Without a copy of the proposed amended complaint, the court is unable to ascertain what claims remain against defendants, as well as whether the proposed amendments are futile.

In addition, Anderson's motion fails to articulate good cause for waiting to file the motion well past the June 24, 2014 deadline for motions to amend pleadings contained in the April 10, 2014 amended conference and scheduling order. (ECF No. 89 at 2). Anderson has not filed a motion to amend the scheduling order to enlarge the time period to file a motion to amend the pleadings. Anderson now seeks to add a claim for abuse of process, although her argument throughout the case has been that the USSS did not follow proper procedure while investigating her criminal case. *See* (ECF Nos. 3, 37). Therefore, Anderson does not have good cause for

failing to include this claim prior to the expiration of the time period to amend the pleadings in the scheduling order.

Insofar as Anderson seeks to name Jolliff as an additional defendant, the court denies that request. Anderson seeks to add Jolliff because of facts learned at Jolliff's deposition. At the hearing on the motion for summary judgment, the court was informed that the deposition of Jolliff occurred in January 2015, eleven months prior to the motion to amend being filed. Anderson's motion fails to explain why she did not exercise diligence by filing this motion earlier. Moreover, Anderson has not set forth any facts showing that the information learned at Jolliff's deposition could not have been discoverable through reasonable diligence prior to the expiration of the time period to amend the pleadings in the amended scheduling order. And finally, in light of the court's previous order dismissing all of the individual defendants except Kerns (ECF No. 84), the motion fails to articulate what non-futile claim the amended complaint could assert against Jolliff. In sum, the motion to amend the complaint is denied.

## II. FTCA

"The United States, as sovereign, is immune from suit save as it consents to be sued . . . ." *United States v. Sherwood*, 312 U.S. 584, 586 (1941) (citations omitted). The FTCA waives sovereign immunity and imposes tort liability on the United States "in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674. In addition, the United States has waived its sovereign immunity

> for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b)(1).  Anderson seeks to impose liability on the United States under three theories: (1) supervisory liability; (2) negligence; and (3) respondeat superior.  Under each standard, the court applies substantive South Carolina law to determine whether the United States is liable.  *See id.*

### a.  Supervisory Liability

The waiver of the United States' sovereign immunity is subject to exceptions.  One such exception is the "discretionary-function exception," which provides that the FTCA's waiver of sovereign immunity shall not apply to:

> Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. § 2680.

The United States has argued that Anderson's claims for negligent hiring, supervision, and retention fall within the discretionary-function exception to the FTCA.  At the hearing, Anderson's attorney clarified that her only claim under Count III of the amended complaint (ECF No. 37) is for negligent supervision, not negligent hiring or retention.  Anderson argues that the discretionary-function exception does not apply to negligent supervision.

When analyzing whether conduct is discretionary, the first step is to determine "whether the challenged conduct 'involves an element of judgment or choice.'"  *Suter v. United States*, 441 F.3d 306, 310 (4th Cir. 2006) (quoting *Berkovitz v. United States*, 486 U.S. 531, 536 (1988)).  If the conduct involves an "element of judgment or choice," the court next determines "whether the challenged action is 'based on considerations of public policy.'"  *Id.* at 311 (quoting *Berkovitz*, 486 U.S. at 536–37).

In *Suter*, the Fourth Circuit stated, in a footnote, that "[a]ppellants' claim that the FBI negligently hired and supervised [its employee] is barred by the discretionary function exception. Courts have repeatedly held that government employers' hiring and supervisory decisions are discretionary functions." *Id.* at 311 n.6; *see also LeRose v. United States*, 285 F. App'x 93, 97 (4th Cir. 2008) ("The BOP's decisions regarding the hiring, supervision and retention of [its employee] are precisely the type of decisions that are protected under the discretionary function exception. We previously decided that government employers' hiring and supervisory decisions are discretionary functions."); *Kaufman v. United States*, 84 F. Supp. 3d 519, 530 (S.D.W. Va.) *aff'd*, 601 F. App'x 237 (4th Cir. 2015) ("Courts in the Fourth Circuit have long held that decisions regarding supervision of employees fall within the discretionary function exception.").

Notwithstanding the case law on the applicability of the discretionary-function exception to supervisory decisions, Anderson asserts two reasons why the discretionary-function exception does not apply in this case.  (ECF No. 152 at 15–21).  First, Anderson claims that the United States waived any defense based on the discretionary-exception because the United States did not plead the defense.  (ECF No. 152 at 15–16).  Anderson cites to *Stewart v. United States*, 199 F.2d 517 (7th Cir. 1952), in support of her argument that the discretionary-function exception defense can be waived by failing to plead it.  The magistrate judge properly discussed the widespread rejection of the *Stewart* case, and the inapplicability of waiver to this defense.  In her objections, Anderson merely cites to the *Stewart* case again and reasserts the same argument that she made to the magistrate judge.  (ECF No. 168 at 2).  *See Nichols v. Colvin*, No. 2:14-cv-50, 2015 WL 1185894, at *8 (E.D. Va. Mar. 13, 2015) (stating that "a mere restatement of the arguments raised in the summary judgment filings does not constitute an 'objection' for the purposes of district court review" (citation omitted)).  The court agrees with the magistrate judge

that the discretionary-function exception is not subject to waiver because it was not affirmatively raised earlier.

Second, although Anderson conceded that the decision to hire Kerns was initially discretionary, she argues the alleged failure to supervise him was not. (ECF No. 152 at 16–19). Anderson asserts that discretionary-function exception does not apply to operational activities, such as supervisory decisions. (ECF No. 152 at 18–19). She asks this court to infer that the USSS has a policy against agents meeting alone with suspects of the opposite sex. (ECF No. 168 at 16). Anderson, however, misstates the law. In 1991, the United States Supreme Court stated "[d]iscretionary conduct is not confined to the policy or planning level," and that operational functions and day-to-day supervisory decisions can fall within the ambit of the discretionary-function exception. *United States v. Gaubert*, 499 U.S. 315, 325–26 (1991).

The claims for negligent supervision involve elements of judgment and choice. Anderson's claims are based on the USSS failing to supervise, or watch over, Kerns. Staffing requirements and the discretion given to agents to carry out an investigation implicate public policy. Anderson has failed to identify any policy that the supervisors failed to follow. As to the court making an inference that an agent cannot meet alone with a suspect of the opposite sex, Anderson has failed to offer any proof that such a policy exists or that Kerns's supervisors permitted him to violate it. In other words, even if a policy existed, Anderson has failed to introduce any evidence showing that the supervisors were not enforcing the policy, let alone that they knew Kerns met alone with Anderson. In sum, the court finds that the magistrate judge properly discussed the inapplicability of this "exception" to the discretionary-function exception. (ECF No. 157 at 14–16).

However, even if the court were to assume that the discretionary-function exception did not apply in this case, the magistrate judge properly determined that no genuine issue of material fact exists as to whether the supervisory-liability claims have merit. (ECF No. 157 at 17–26). In South Carolina, an employer may be liable for negligent supervision when an employee intentionally harms another and (1) the employee is on the premises of the employer or using a chattel of the employer, (2) the employer knows or has reason to know of the ability to control the employee, and (3) the employer knows or should know of the necessity and opportunity for exercising control. *See Degenhart v. Knights of Columbus*, 420 S.E.2d 495, 496 (S.C. 1992). Stated differently, "[i]n circumstances where an employer knew or should have known that its employment of a specific person created an undue risk of harm to the public, a plaintiff may claim that the employer was itself negligent in hiring, supervising, or training the employee . . . ." *James v. Kelly Trucking Co.*, 661 S.E.2d 329, 330 (S.C. 2008).

Three South Carolina cases are helpful when determining whether an employer is liable for failing to supervise an employee when that employee commits a sexual assault. *See Brockington v. Pee Dee Mental Health Ctr.*, 433 S.E.2d 16 (S.C. Ct. App. 1993); *Doe by Doe v. Greenville Hosp. Sys.*, 448 S.E.2d 564 (S.C. Ct. App. 1994); *Moore by Moore v. Berkeley Cnty. Sch. Dist.*, 486 S.E.2d 9 (S.C. Ct. App. 1997). In *Brockington*, Davis, the employee, was a therapeutic assistant employed by the South Carolina Department of Mental Health, assigned to a facility where Brockington was a patient. 433 S.E.2d at 17. Davis worked without supervision, and he scored well on his evaluations. *Id.* During Brockington's first visit with Davis, Davis sexually assaulted him. *Id.* A week later, Davis sexually assaulted Brockington again. *Id.* Brockington did not tell the police or Davis's supervisors; he only told his mother and his brother, and neither family member told anyone. *Id.* Months later, Davis sexually assaulted

another client, and that client's mother reported the assault.  *Id.*  Davis later pled guilty and was sentenced to prison.  *Id.*  Brockington filed suit, and the jury found in his favor on the issue of negligent supervision.  *Id.*  The employer appealed.  *Id.* at 19.  On appeal, the court of appeals reversed because Brockington failed to introduce any evidence that would have "alerted the defendants that Davis would engage in predatory homosexual activity or other inappropriate sexual conduct with clients and with Brockington in particular."  *Id.* The court noted that "Brockington, his mother, and his brother . . . kept [their knowledge of Davis's behavior] to themselves."  *Id.*  Brockington contended that a department manual placed a duty on the defendants to supervise Davis.  The court of appeals stated that no such duty was imposed because "[c]learly, Davis was acting in his individual capacity and not as an agent for the defendants when he sexually assaulted Brockington."  *Id.*

In *Greenville Hosp. System*, the court of appeals affirmed a finding of negligent hiring and supervision by Greenville Hospital System because it had prior knowledge that its employee, a thirty-one-year-old male, had previously sexually assaulted another employee, a sixteen-year-old minor, while they were working. 448 S.E.2d at 565.  The male employee sexually assaulted the minor on two separate occasions.  *Id.*  at 568.  The first incident occurred in the summer of 1990.  *Id.*  Although the minor did not report the incident, the hospital became aware of the incident and investigated it.  *Id.*  Instead of terminating the male employee, the hospital transferred him to a different division.  *Id.*  After the transfer, the male employee sexually assaulted the minor again in May 1991.  *Id.*  This time the minor reported the incident.  *Id.*  The court of appeals found that although the hospital lacked knowledge before the 1990 incident, it "was aware of the allegations of inappropriate behavior" by the male employee towards a minor when the May 1991 incident occurred.  *Id.*

In *Moore by Moore*, the court of appeals affirmed the granting of summary judgment in favor of a school district after Steward, a teacher, sexually assaulted a minor student, Moore, during the summer-school term. 486 S.E.2d at 585. Moore argued that the school district was grossly negligent in supervising and hiring Steward, and by appointing Paul Hilson as acting principal. *Id.* at 586. Moore testified that Steward's classroom was not run in the normal fashion: "The students did not do any work in her class. They were rowdy and sat around talking. The radio was often playing. Steward permitted the students to smoke cigarettes in class and on one occasion Moore observed her smoking marijuana with other students during a break." *Id.* at 11. Moore testified that Hilson visited the classroom and witnessed how Steward ran her classroom. *Id.* Other teachers observed "a male student massaging Steward's shoulders, students sitting around chatting, students walking around, a male student answering the locked door to Steward's classroom when the lights were off, and Steward holding hands with a male student." *Id.* The other teachers, however, did not report what they saw to the school's administration. *Id.* During the school year, Steward told Moore that he would need to make up a missed day of class, and that she would tutor him in her home. *Id.* at 12. While at her house, "they smoked marijuana and engaged in sexual intercourse." *Id.* Moore did not report the incident until after other students reported Steward for sexual behavior. *Id.*

The court of appeals found that "[t]here is no evidence in this case that the District had notice of improper sexual contact between Steward and any other students prior to the incident involving Moore." *Id.* at 13. The court found that no one "ever complained to the District . . . about Steward's conduct during summer school or her tutoring in her home." *Id.* The court said that the evidence only showed that Steward ran her classroom "in a lax manner." *Id.* As to whether Hilson "adequately monitored Steward's classroom," the court found that "none of the

alleged classroom incidents were of such a character that the administration would have, if aware of them, reasonably anticipated that Steward would engage in sexual intercourse with a student in her own home after school hours." *Id.*

In this case, Anderson has failed to produce any evidence that would show that the United States had reason to know that Kerns would engage in sexual activities with a suspect. Similar to in *Brockington* and in *Moore* where the victims did not tell any supervisors of the assaults; here, Anderson testified that she never told any employee of the United States about Kerns's behavior prior to April 2011.  (ECF No. 157 at 49).  Also, unlike in *Greenville Hosp. System* where the supervisors learned of allegations of a sexual assault through other sources; in this case, there is no evidence that the United States found out about the sexual activity through other sources.  All of Kerns's coworkers testified that they were unaware of Kerns's alleged conduct until April 2011.  (ECF No. 157 at 19).  The United States introduced evidence that it is not unusual for officers to work out of the office during office hours.  (ECF No. 157 at 20–21). Moreover, even if Kerns failed to *Mirandize* and follow criminal procedure rules when initially processing Anderson, such evidence would not lead to an inference that the United States should have known that Kerns would engage in sexual activity with Anderson.  *See Moore*, 486 S.E.2d at 13; *Brockington*, 433 S.E.2d at 18.

At the summary judgment stage, Anderson was required to come forth with specific evidence showing that the United States knew or should have known Kerns would engage in sexual activity with a suspect.  Anderson cannot rely on her complaint or make speculative claims about how the United States might have had knowledge of Kerns's behavior.  *See Dash*, 731 F.3d at 311 (4th Cir. 2013) (stating that "the nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere

existence of a scintilla of evidence"). Because Anderson has not met that standard, even if the allegations of failure to supervise did not fall within the discretionary-function exception to the FTCA, the United States would still be entitled to summary judgment on the claims.

### b. Stand-Alone Negligence

In her stand-alone negligence claim, Anderson appears to be asserting that the United States, through its employees other than Kerns, breached a duty to Anderson by failing to follow its procedures. The court finds that Anderson has failed to articulate how this claim is different than a failure to supervise. The claim appears to be based on Kerns failing to follow an alleged policy that he was not supposed to meet a suspect of a different sex alone. (ECF No. 168 at 17). That claim would be for a failure to supervise, which the court found without merit. In any event, the magistrate judge properly discussed this claim in her well-written Report.

### c. Respondeat Superior

The court finds that the United States is not vicariously liable for the acts of Kerns. In South Carolina, an employer is liable for the torts of his employee when the employee commits the act in question "about his [employer's] business and acting within the scope of his employment." *Lane v. Modern Music, Inc.*, 136 S.E.2d 713, 716 (S.C. 1964). "An act is within the scope of a servant's employment where reasonably necessary to accomplish the purpose of his employment and is in furtherance of the master's business." *Id.* However, an "act of a servant done to effect some independent purpose of his own and not with reference to the service in which he is employed, or while he is acting as his own master for the time being, is not within the scope of his employment." *Id.* Thus, when the employee "steps aside from the [employer's] business for some purpose wholly disconnected with his employment, the relation of master and

servant is temporarily suspended, . . . no matter how short the time" the employee steps away.

*Id.* (citations omitted).  Moreover,

> An employer is not liable to a customer, patron or other person for an assault arising out of acts of mischief or horseplay indulged in by the employee unless it is shown that the employer was or should have been so aware of the propensities of the employee in that direction as to make him negligent for having retained him in the employ, since such acts are not to be considered incidental to the work which he is hired to perform but are of a personal nature, indulged in for the person amusement of the employee and not in furtherance of the master's interest.

*Hamilton v. Davis*, 389 S.E.2d 297, 299–300 (S.C. Ct. App. 1990) (quoting *Lane*, 136 S.E.2d at 717).

In *Hamilton*, the court of appeals affirmed a state court's finding that an employee was acting outside the scope of his employment when he hit the plaintiff with his truck while performing work duties.  *Id.* at 417.  In that case, the employee was hired to manage rental properties, including maintaining the grounds.  *Id.* at 412–13.  While cleaning up debris, a tenant climbed onto the back of the employee's truck.  *Id.* at 413.  The employee started to laugh and put the truck into reverse, injuring the plaintiff.  *Id.*  The court of appeals held:

> While [the employee] was certainly in the act of furthering his master's business in collecting the debris and removing it from the yard, he momentarily stepped away from that business when he committed the assault on Hamilton. The assault was clearly of a personal nature, indulged in for his own personal amusement.

*Id.* at 417.

South Carolina courts have specifically considered whether an employee was acting within the scope of his employment when he commits a sexual assault.  In all four cases,[6] South Carolina courts have found that the sexual advances were outside the scope of employment. *See*

---

[6] Although these cases address whether acts are covered under an insurance policy covering "course of employment," South Carolina courts apply the same standard in cases involving scope of employment.  *See S.C. State Budget & Control Bd. v. Prince*, 403 S.E.2d 643, 646 (S.C. 1991).

*Frazier v. Badger*, 603 S.E.2d 587, 591 (S.C. 2004) (holding an assistant principal was acting outside the scope of his employment when he made sexual advances on a teacher); *Doe v. S.C. State Budget & Control Bd.*, 494 S.E.2d 469, 473 (S.C. Ct. App. 1997) (holding "no cogent argument could be made" that a police officer was furthering his employer's business by having intercourse with suspects); *Loadholt v. S.C. State Budget & Control Bd.*, 528 S.E.2d 670 (S.C. Ct. App. 2000) (holding a sheriff was acting outside the scope of his employment when he sexually assaulted subordinates); *Padgett v. S.C. Ins. Reserve Fund*, 531 S.E.2d 305 (S.C. Ct. App. 2000) (holding a professor was acting outside the scope of his "official duties" when he sexually assaulted a student).  In sum, under South Carolina law, "sexual harassment by a government employee is not within the employee's 'scope of employment.'"  *Frasier*, 603 S.E.2d at 591.

In *Doe*, the court of appeals and the supreme court considered whether sexual assaults by a police officer against two suspects were covered by insurance policies.  523 S.E.2d at 458.  Roberson, a police officer, pulled Doe over on suspicion of driving under the influence.  *Id.*  He gave her the "option of being arrested or having sex with him."  *Id.*  Roberson and Doe engaged in sexual activity.  *Id.*  Roberson later pulled Roe over and gave her the same option that he had given Doe.  *Id.*  Roe agreed to have sex with him in exchange for not being arrested.  *Id.*  Roberson and Roe went to another location and had intercourse in the police cruiser.  *Id.*  The court of appeals held that "no cogent argument can be made that Roberson was furthering the business of his employer at the time he sexually assaulted Appellants."  494 S.E.2d 469, 473 (S.C. Ct. App. 1997).  The supreme court affirmed the decision. 523 S.E.2d at 458.

In *Loadholt*, the court of appeals considered whether a sheriff's sexual assaults and harassment of subordinates were within the scope of employment.  528 S.E.2d at 671.  The

sheriff summoned three different employees—a dispatcher, a jailer, and a secretary—"to his office on the pretext of discussing jail and sheriff's department business.  Once in his office, [the sheriff] would lock the door and then ask them questions regarding their sexual histories and sexually molest or assault them."  *Id.* at 672.  The employees filed suit, and on appeal, the court of appeals considered, amongst other issues, whether the sexual assaults were within the "course of employment" for purposes of a state statute covering tort liability for acts committed in the course of employment.  *Id.* at 674.  The court of appeals stated that "although [the sheriff] was on duty as sheriff, working in his county office and allegedly 'discussing county business' prior to and at the time of the alleged assaults, . . . [his] alleged sexual assaults were outside the 'course of employment' . . . as [the sheriff] was not furthering the business of his employer at the time of the alleged assaults."  *Id.*

In this case, the court finds that Kerns was acting in furtherance of his own personal interests, and not in the interests of the United States, when he engaged in sexual activity with Anderson.  Similarly to *Hamilton* where the employee stepped outside the scope of employment when he engaged in mischief; here, Kerns stepped outside the scope of his employment when he engaged in sexual behavior.  *See also Loadholt*, 528 S.E.2d at 674.  Moreover, similarly to how the on duty officer in *Doe* was not acting within the scope of employment when he sexually assaulted the victims, during the Greenwood Incident, Kerns was acting outside the scope of employment when he engaged in sexual conduct with Anderson.  *See Frasier*, 603 S.E.2d at 591.

As to the Greenville Incident, the court finds that no reasonable juror could conclude that the sexual encounter between Kerns and Anderson furthered the interests of the United States.  The incident occurred after 11 p.m. when the office was closed.  Anderson testified at her deposition that they did not discuss her case.  *See* (ECF No. 152-25) (testifying that "he told me

it was about my case, [but] then when I got there it wasn't about my case.  He would do that to me all the time.").  The court finds that instead of furthering the USSS's interests, Kerns was furthering his own personal interests during the Greenville Incident.  No reasonable juror could conclude that Kerns's entering the GRO at 11:35 P.M. to engage in intercourse with a suspect in Kerns's boss's office could in any way further the interests of the United States.

Anderson cites two cases to support her theory that Kerns was acting within the scope of employment when the sexual activity took place: *Millbrook v. United States*, 133 S. Ct. 1441 (2013), and *Crittendon v. Thompson-Walker, Co.*, 341 S.E.2d 385 (S.C. Ct. App. 1986).  In *Millbrook*, the plaintiff, an inmate, was sexually assaulted by prison guards.  The issue before the Court was the scope of the "law enforcement proviso" in the FTCA, and the Court held that the waiver of immunity extends to "acts or omissions of law enforcement officers that arise within the scope of their employment."  133 S. Ct. at 1446.  This case is unhelpful to Anderson.  First, the scope of employment issue was not before the Court because the United States had conceded the issue in the lower courts.  *Id.* at 1445 n.3.  In this case, the United States has made no such concession.   Second, even if the Court had considered the scope of employment issue, the case arose out of Pennsylvania and would have applied Pennsylvania law, not South Carolina law. Therefore, Anderson's reliance on *Millbrook* is misplaced.

In *Crittenden*, Crittenden hired Thompson-Walker to renovate a business.  341 S.E.2d 386.  Several days prior to completing the renovation, Thompson-Walker sent a final bill.  *Id.* Crittenden informed Thompson, the president of Thompson-Walker, that the bill would not be paid and to contact his attorney.  *Id.*  Thompson decided to follow up at Crittenden's store with his foreman who beat up Crittenden in Thompson's presence until Crittenden agreed to pay his

bill.  *Id.*  The court of appeals held that the assault furthered the employer's business because it was done for the purpose of receiving a payment on a bill.  *Id.* at 116.

Anderson attempts to analogize her case to *Crittendon* by arguing that Kerns was furthering the interests of the United States by getting a guilty plea when he had sexual intercourse with Anderson.  This argument is unpersuasive.  Kerns's first concern when he admitted to the engaging in sexual activities with Anderson was that he had compromised the prosecution of the case, not that he was somehow helping the United States.  (ECF No. 150-14).  In addition, the evidence shows that Anderson cooperated well before any sexual behavior started, and that in her single-defendant criminal case, and prior to any inappropriate behavior, she had given incriminating statements and returned a portion of the embezzled money to the bank.  In sum, the court finds, as the South Carolina cases have concluded when determining whether a sexual assault by an employee falls within the scope of employment, that Kerns was acting outside the scope of employment when he engaged in sexual activity with Anderson.[7]

### III.  *Bivens* Claims

At the December 8, 2015 hearing, the court asked the parties to file briefs concerning the impact, if any, that a judgment in favor of the United States would have on Anderson's individual claims against Kerns.  (ECF No. 182).  Kerns and the United States filed briefs arguing that a judgment in favor of the United States would result in dismissal of the claims against Kerns.  (ECF Nos. 184, 185).  Anderson filed a brief arguing that a judgment in favor of the United States on the FTCA claims would not bar or impact her ability to present claims against Kerns.  (ECF No. 187).

---

[7] Many Fourth Circuit cases applying South Carolina law have concluded that an employee was acting outside the scope of employment when that employee engaged in sexual behavior while "at work."  *See, e.g.*, *Doe v. United States*, 769 F.2d 174 (4th Cir. 1985); *Andrews v. United States*, 732 F.2d 366 (4th Cir. 1984).

The FTCA has a judgment-bar rule: "The judgment in an action under section 1346(b) of this title shall constitute a complete bar to any action by the claimant, by reason of the same subject matter, against the employee of the government whose act or omission gave rise to the claim."  28 U.S.C. § 2676.  The judgment-bar rule "preclude[s] a *Bivens* claim against a government employee when a judgment has been entered on a FTCA claim 'arising out of the same actions, transactions, or occurrences' as the *Bivens* claim."  *Unus v. Kane*, 565 F.3d 103, 122 (4th Cir. 2009) (quoting *Estate of Trentadue ex rel. Aguilar v. United States*, 397 F.3d 840, 858 (10th Cir. 2005)).  In *Unus*, the Fourth Circuit stated that:

> Litigants frequently face tough choices—choices that rarely come without consequence. In these proceedings, the plaintiffs chose to pursue their claims against the federal agent defendants through *Bivens* as well as under the FTCA. As such, they risked having a judgment on the FTCA claims operate to bar their *Bivens* theories. As explained above, the district court properly awarded summary judgment to the United States on the FTCA claims. Those claims arose out of the "same subject matter" as the First and Fourth Amendment *Bivens* subclaims—the execution of the Warrant—by the "employee of the government whose act or omission gave rise to the claim," i.e., the federal agent defendants. As such, the court's summary judgment award on the FTCA claims triggers the judgment bar provision of § 2676, and the plaintiffs' First and Fourth Amendment *Bivens* subclaims against the federal agent defendants are thus barred.

*Id.* at 122.[8]

In this case, Anderson decided to pursue dual-track claims against Kerns and the United States for alleged misconduct of Kerns.  (ECF No. 37)  The United States is entitled to summary judgment on the FTCA claims, and those claims arose out of the same conduct that is the

---

[8] In her brief, Anderson fails to address *Unus*, except to say that she believes the case does not comport with *Carlson v. Green*, 446 U.S. 14 (1980), a case that Anderson relies on extensively. (ECF Nos. 187; 190 at 2). Her reliance on *Carlson* is misplaced.  The issue in *Carlson* was whether a litigant could file a *Bivens* suit when the plaintiff could have also filed a claim pursuant to the FTCA.  446 U.S. at 16–17.  The court found "that Congress views FTCA and *Bivens* as parallel, complementary causes of action."  *Id.*  at 20.  Therefore, under *Carlson*, Anderson can file parallel claims under the FTCA and pursuant to *Bivens*.  The issue the court asked the parties to brief was what impact, if any, a judgment on the FTCA claim has on the *Bivens* claim, not whether Anderson could have brought a *Bivens* claim had she not pursued an FTCA claim.  *See Sanchez v. McLain*, 867 F. Supp. 2d 813, 820–22 (S.D.W. Va. 2011).

underlying basis of Anderson's allegations against Kerns.  (ECF No. 37).  Therefore, 28 U.S.C. §

2676 bars the remaining claims against Kerns.  *See Unus*, 565 F.3d at 122.

**CONCLUSION**

The court finds the Government's motion to dismiss and for summary judgment should

be **GRANTED**.  In addition, pursuant to 28 U.S.C. § 2676, the remaining claims against Kerns

are hereby **DISMISSED**.  The motion to amend the complaint (ECF No. 179) is **DENIED**.

**IT IS SO ORDERED.**

s/Timothy M. Cain
United States District Judge

January 27, 2016
Anderson, South Carolina